BEFORE THE SECOND DIVISION, APRIL 26, 1965

No. 69266.—J. J. Gavin & Co., Inc., and The Cottrell Company et al. *v.* United States, protests 59/19447, etc. (New York).

FORD, Judge: The cases listed in schedule "A," attached hereto and made a part hereof, consolidated for the purpose of trial, bring before the court the claim of plaintiffs that the classification by the collector of customs of certain machines, designated as "RAPID-d" slitting machines and the "PRACTICA" slitting machines, and assessed with duty at the rate of 13¾ per centum ad valorem under the provisions of paragraph 353 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, is erroneous.

It is the position of plaintiffs herein that the imported machines do not have as an essential feature an electrical element or device to bring them within the purview of said paragraph 353 of the Tariff Act of 1930, as modified, *supra*, and are more correctly subject to classification under the provisions of paragraph 372 of the Tariff Act of 1930, as modified by the Sixth Protocol to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, and, as such, dutiable at the rate of 12 per centum ad valorem or 11½ per centum ad valorem, depending upon the date of entry or withdrawal from warehouse, as machines, "other," not specially provided for, or at the same rate of duty, as "parts" under the same paragraph with respect to parts.

The pertinent portions of the statutes involved herein read as follows:

Paragraph 353 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, *supra:*

Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:

   *      *      *      *      *      *

Other (except * * *) _____ 13¾ ad val.

Paragraph 372 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, *supra:*

Machines, finished or unfinished, not specially provided for:

   *      *      *      *      *      *      *

Other (except * * *) _____ 12% ad val. or 11½% ad val.

Parts, not specially provided for, wholly or in chief value of metal or porcelain, of any article provided for in any item 372 in this Part. — The rate for the article of which they are parts.

The record herein consists of the testimony of Peter Van Gunten, called on behalf of plaintiffs, and the receipt in evidence of two brochures covering the two types of machines involved herein, which were received in evidence as plaintiffs' illustrative exhibits 1 and 2, and a roll of 'paper produced by the machine depicted by plaintiffs' illustrative exhibit 2, which was received in evidence as plaintiffs' illustrative exhibit 3.

Mr. Van Gunten described the operation of the "RAPID-d" machine as follows:

A. A slitter rewinder, which the Rapid-D is a type, takes what we call a parent roll, a mill roll of paper such as would come from a paper mill shipped direct to a paper converter.

Q. How large would that be?—A. Perhaps 40 inches in diameter and 50 or so inches wide. Now, the Rapid-D machine will take this roll, will be mounted on the back of the machine and unwound, and run over idlers into a cutting head, which would then split the paper into nominal widths and rewind it.

\* \* \* \* \* \* \*

A. Now, the Rapid-D is a center-wind machine, which means that the rewinding shaft, after the material is split it is wound on a shaft which is called a rewind shaft. And this rewind shaft is driven, is turning. And this causes—this is what pulls the paper through the machine.

The witness also described the operation of the machine, designated as the "PRACTICA," as follows:

A. The Practica, again, receives a mill roll of paper. I am using paper as an example, we also do foil and cellophane on these machines, but paper being the most familiar thing. But the operation is identical. We take a mill roll, again, 40 inches wide in diameter, and either 40 or 50 inches wide, unwind it over a series of idlers, through a cutting head, and rewind it. In this case we rewind much smaller rolls than we do on the Rapid-D. And we are making—adding machine rolls would be the easiest example to give you. That roll is done on a Practica.

\* \* \* \* \* \* \*

Q. Would you proceed with your description of the operation of the Practica?—A. The operation of the Practica, here we are using very small cores on this exhibit. There is a small wooden core in the center of the rewound roll.

Q. That's Exhibit 3 you referred to?—A. Exhibit 3. And in using the small core it is necessary to use a different type of winding method than we use on a Rapid-D. We use in this case a surface winding method, which means that the winding impulse is transmitted to the surface of the paper rather than to the core. The end result is the same, and it's a little bit more complicated method of winding. This machine will run at speeds up to a thousand feet a minute. I think that fairly well covers it, unless you would like more technical information.

A prime mover in both instances, as used in this country, is a domestic electric motor, which is provided after importation. In both these machines, the prime mover is bolted to the machine but it is not so required, and the power is transmitted to the machines by V-belts. In the case of the "RAPID-d" machines, in addition to the drive motor, a special rheostat is also supplied after importation. The rheostat is used to control the electric field in the drive motor, thereby maintaining a constant surface speed of the roll. This is utilized because, as the roll gets larger and larger, the surface speed increases. The rheostat is not used in the country of manufacture. The same result could be accomplished by controlling the speed of the main drive. There are no other electrical features in the "RAPID-d" machine.

With respect to the "PRACTICA" machine, in addition to the prime mover, which is domestically supplied after importation, there is, in its condition as imported, a fractional horsepower motor called a booster motor, which is actuated by a foot pedal. This booster motor lifts and lowers the rider roller

to enable the operator to remove the rewound rolls. Witness Van Gunten testified that said booster motor was not essential since the operation could be easily accomplished mechanically, by adding a bracket to mount a shaft with a gear on the end of it. This could be accomplished for approximately $100. There is also attached to the machine at the time of importation a transformer which supplies compatible voltage to the booster motor.

In addition to the foregoing, there is also attached to the "PRACTICA" at the time of importation an automatic diameter shutoff. This device is set for a particular size diameter and, when the rewound roll attains the desired size, the position of the rider roller actuates a microswitch which shuts off the drive. This device, in the opinion of the witness, was not essential since a scale ruler on the rider roller could be utilized by the operator who would stop the machine at the desired size. Another method which would accomplish the same thing would be to utilize a footage counter.

The witness also testified as to the parts imported herein and considered all of them to be essential to the operation of the imported machines and to have no other use than as parts of the imported machines.

Based upon the record and following the principles set forth in the cases of *United States* v. *Dryden Rubber Co.*, 22 CCPA 51, T.D. 47050; *United States* v. *Baker Perkins, Inc., R. F. Downing Co., Inc.*, 46 CCPA 128, C.A.D. 714, plaintiffs contend the imported machines, for tariff purposes, do not have as an essential feature an electrical element or device and are, therefore, properly subject to classification as machines, "other," under the provisions of paragraph 372 of the Tariff Act of 1930, as modified, *supra.*

The leading case, of course, on the subject matter is the *Dryden* case, *supra,* wherein the appellate court stated:

* * * The electrical feature must be an essential feature, without which the article will not function, normally, for the purposes intended, * * *.

From what has been said, it follows that if the article, when it is imported, is designed and constructed to use electrical power, or other power, interchangeably, then it has not, as an essential feature, an electrical element or device.

In the *Baker Perkins* case, *supra,* an imported machine powered by an electric motor, which was not imported, was held not to fall within the purview of an article having as an essential feature an electrical element or device, since such power was transmitted to the machine by means of a V-belt and pulley arrangement.

* * * In this day and age the water wheel and steam engine have passed from the commercial scene insofar as the operation of factory machine tools is concerned. One need not look far to discover that almost every machine in a factory is operated by an electric motor as a practical commercial matter. If this fact is to be taken into consideration in construing paragraph 353 then the humblest wood-turning lathe and every other device having a pulley or sprocket on it for the attachment of a drive belt or a chain is going to become an "article having as an essential feature an electrical element or device" because, practically, it is going to be operated by electrical motive power if it is operated at all.

* * * Any source of adequate power connected to that pulley to rotate the shaft would run the machine. Except for practical and commercial considerations, in the operation of a chocolate factory in a given location, the power source would be immaterial. Selection of an electric motor did not make the grinding mill an essentially electrical article. * * *

The basic principles in these cases were followed in a number of decisions by this court. *Ownes-Illinois Glass Company* v. *United States*, 48 Cust. Ct. 263, C.D. 2347; *Roto Bag Machine Corp. et al.* v. *United States*, 48 Cust. Ct. 401, Abstract 66656; *W. C. Sullivan & Company* v. *United States*, 46 Cust. Ct. 31, C.D.

2229; *Arthur J. Fritz & Co.* v. *United States*, 46 Cust. Ct. 215, C.D. 2258; *Keer, Maurer Company* v. *United States*, 48 Cust. Ct. 205, C.D. 2336.

The slitting machines involved herein likewise receive their prime power by means of a pulley and V-belt arrangement, which power may be readily interchangeable with other sources of power. To this extent, neither machine would, for tariff purposes, fall within the purview of the provisions of paragraph 353 of the Tariff Act of 1930, as modified, *supra*. However, there are other features of the machines which must be taken into consideration. Since there are two types of machines, each type will be considered separately.

The RAPID-d, in addition to the prime mover, has a rheostat which controls the electric field of the motor used as the prime mover. It naturally follows that if the electric motor is not essential to the operation of the RAPID-d, the rheostat, which controls it, is not essential. In addition to this, the record establishes that the same result can be accomplished by controlling the speed of the main drive. Consequently, the RAPID-d does not have as an essential feature an electrical element or device and is properly subject to classification under the provisions of paragraph 372 of the Tariff Act of 1930, as modified, *supra*, as claimed by plaintiffs herein.

Aside from the prime source of power of the other machine, the PRACTICA, which, so far as is pertinent for this decision, receives its main source of power in the same manner as the RAPID-d, had in its condition as imported a booster motor of fractional horsepower rating, a transformer, and an electric automatic shutoff device. The record satisfactorily establishes that none of these devices were essential to the operation, although they may have contributed to the convenience and automatic operation of the machine. The booster motor which was actuated by a foot pedal was used to raise and lower the rider roller so as to permit the operator to put his hand in and remove the roll. This was not deemed by the witness to be essential, since the same result could be easily accomplished mechanically. It would require the addition of a bracket to mount a shaft with a gear on it at a cost of approximately $100. The transformer merely supplies the compatible voltage to the booster motor and, therefore, if the booster motor is not essential, neither is the transformer.

The electric automatic shutoff device was not considered by the witness to be essential, since the same result could be accomplished by a scale ruler or footage counter device on the rider roller. By the use of either device when the rider roller reached either the desired diameter or length, the operator would stop the machine.

We are of the opinion, based upon the record and following the principles in the cases set forth, *supra*, that the booster motor, transformer, and automatic shutoff device, while convenient and adding to the automation of the machine, are not, for tariff purposes, essential.

Accordingly, the protests are sustained as to the RAPID-d and PRACTICA slitting machines involved herein which are properly subject to duty at the rate of 12 or 11½ per centum ad valorem, depending upon the date of entry or withdrawal from warehouse for consumption, under paragraph 372 of the Tariff Act of 1930, as modified, *supra*.

Included in the importations involved herein were certain "parts" which the record establishes are essential to the machine and have no other use. Accordingly, we find them to be subject to duty at the same rates as "parts" under said paragraph 372 of the Tariff Act of 1930, as modified, *supra*, depending upon the date of entry or withdrawal from warehouse for consumption.

Judgment will be entered accordingly.