BEFORE THE SECOND DIVISION, OCTOBER 5, 1965

No. 69577.—Berkley Machine Company *v.* United States, protest 61/9236 (Savannah).

FORD, Judge: The imported machine herein, described on the invoice as "1 'HELIOS' Rotary Open Side Envelope Machine Model 129 DS," was classified under paragraph 353 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, under the provision for articles having as an essential feature an electrical element or device. Duty was assessed thereon at the rate of 13¾ per centum ad valorem.

Plaintiff contends that the imported machine does not have as an essential feature an electrical element or device within the meaning of said paragraph 353 and is properly dutiable at the rate of 11½ per centum ad valorem under the provision for other machines contained in paragraph 372 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108.

The pertinent parts of the statutes involved are as follows:

Paragraph 353, as modified by T.D. 52739:

Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:

     *       *      *      *      *      *      *

    Other * * *_____ 13¾% ad val.

Paragraph 372, as modified by T.D. 54108:

Machines, finished or unfinished, not specially provided for:

     *       *      *      *      *      *      *

    Other * * *_____ 11½% ad val.

The issue is whether this envelope-making machine, as imported, could be converted to a source of power other than electrical without substantial modification or reconstruction of the machine *per se.*

Testimony of two witnesses was offered on behalf of the plaintiff, and one witness for the defendant. In addition, six illustrative exhibits were offered by the plaintiff and received in evidence, as follows:

Plaintiff's illustrative exhibit 1—photograph of a Model 129 DS "Helios" machine substantially similar to the one at bar.

Plaintiff's illustrative exhibit 2—schematic drawing of the machine involved herein, with envelope paper and an example of the processed product as it went through the successive steps of manufacture.

Plaintiff's illustrative exhibit 3—photograph of a gas-fired dryer, which might be substituted for the electric dryer.

Plaintiff's illustrative exhibit 4—photograph of vacuum line supply, which might be substituted for three electrically operated vacuum pumps on the imported machine.

Plaintiff's illustrative exhibit 5—photograph of blower driven from main line shaft, which might be substituted for imported machine's two electrically operated blowers.

Plaintiff's collective exhibit 6—diagrams showing various other driving arrangements possible for the imported machine.

James W. Lenk, vice president of the plaintiff company, the first witness for the plaintiff, testified that he has been affiliated with the envelope industry since 1947. He received a mechanical engineering degree in 1953 and has been in the employ of the plaintiff and other companies affiliated with the envelope industry since June 1956. He has done considerable related work, having seen several hundred envelope-making machines in the United States, Canada, Mexico, and Germany, where the instant equipment is manufactured. Plaintiff's business is to sell equipment used in the production of envelopes. He saw the instant machine in actual operation, and identified plaintiff's exhibit 1, a photograph of a substantially similar machine. He described its operation as follows:

* * * This machine is designed to take dyed-out envelope blanks as illustrated on numeral 1 above and convert them into finished envelopes. In the process the machine can cut out a window opening in the envelope, patch that window opening with some type of suitable film such as glassine or cellophane, apply seal flap gum, make the necessary folds, apply the necessary gum to hold the folds into position. The particular model of machine in question here can also print one color on the outside of the envelope blank and one color on the inside of the envelope blank.

He stated that the machine, as imported and delivered, had electrical equipment and was operated electrically. In his opinion, it would be possible to operate the machine by other means than electrically by replacing its 10 motors with other rotating sources of power, such as diesel, gasoline, turbine, or steam engines. One engine could be substituted for the 10 motors. He described the operations of the 10 motors as follows:

Two motors drive an agitator in the inking system of the machine. Three motors drive three separate vacuum pumps which are normally provided with the equipment. One motor drives a small air compressor. The vacuum compressed air is used in the transferring and handling of blanks throughout the machine. There is a main drive motor which has a pilot motor on top of it, the pilot motor being used to change the speed of the main drive motor. There is a motor which supplies a low velocity air blow in the drying system. And there is a motor which turns a large fan, is the best word I can think of, which draws out the waste panel, that is the chip cut out of the envelope from the cutting section of the machine, and deposits it in a waste box sitting alongside.

On inquiry by the court as to what would need to be done to the machine, and specifically to each of its 10 present motors, to convert it from electrical to another power source, the time, labor, skill, material, and expense involved, the

witness stated that the main drive motor would require replacement first, preferably a power source that would afford varying speeds. The witness said this would be a relatively minor operation, merely a matter of fitting a pulley to the output shaft of a motor and fitting that motor to the machine. To do this, a new pulley might have to be utilized, either a Reeves drive or some type of transmission. Other than the motor itself, the expense involved would be $15 to $25. The pilot motor, which is an integral part of the main drive motor, would be replaced at the same time. The two ⅛ horsepower motors, which operate the ink pumps, could be replaced by a flexible coupling off one of the rotating shafts at a cost of $10, or by utilizing a Gray-Mills air-pressure-operated motor, which would cost "$25 more than the type of pump normally supplied." If the replacement motor for the main drive motor has a constant speed takeoff shaft, the three motors which drive the three vacuum pumps "could be driven from that power take-off shaft by means of a line shaft appropriately mounted into position from pulleys at a cost, I would say, of approximately $100 for materials." He estimated the total cost for the changes on the machine itself to be "a couple of hundred dollars" and said that it could be carried out by a good mechanic.

The witness continued with details of further possible changes, stating that such changes, in his opinion, would not involve substantial modification, that the efficiency of the machine would remain the same, and that an average mechanic, not necessarily an electrician, could remove all of the electrical components and install their replacements in a day and a half. He also stated that he had never seen or known of any of these machines so converted from electricity to any other source of power and that it was the intention and understanding of the manufacturer and importer of the machine that it was to operate electrically.

On redirect examination, he stated that when he estimated $200 as the cost of conversion he "was referring only to those components external to the power source which might be extra shafting, structural material, and bearings to hold the shafting in position, pulleys of the kind described, items of that nature." He did not include the cost of labor, he said.

Under recross-examination, he stated that "To my knowledge the machine has always been sold for use with electrical equipment."

The witness estimated that the cost of a substitute main drive motor, depending on the type thereof, would be about $1,100, that the replacement would have nothing to do with the machine itself, but would sit outside the machine, just as the motor does; that a replacement motor for the one-eighth horsepower for the ink pump would cost about $25 more than the $22, which is the cost of the motor currently in use.

The witness further stated that the gas-fired heater, illustrated in plaintiff's exhibit 3, cost about $300 to produce and although "It's never been sold at retail," it "presumably" would cost a good deal more at retail. The blower shown in exhibit 5 would cost $65 to $75. The machine "was not designed to operate from any particular source of power," but, in concluding on recross-examination, he stated: "To my knowledge the machine has always been sold for use with electrical equipment." He agreed that it was the intention at the time of purchase to operate the machine electrically and also that he has never heard of any of these machines being converted from electricity to another source of power.

Mr. Lenk testified that the machine does not perform its operations electrically, but mechanically; it is not necessary that the aniline ink be inflammable; the substitution of other power would not create a more dangerous condition

than electricity; the "limit switches" are safety devices but not essential to the operation of the machine; if the electrical features were removed, the basic machine would not require "tangible structural modifications." The machine, as supplied to Southeastern Envelope Co., uses a main drive motor and a pilot motor, plus eight other motors.

Max H. Johnson, an electrical engineer for the past 15 years, testified for the plaintiff as follows: He had observed the operation of the 129 DS machine at the plant of the Southeastern Envelope Co. in Atlanta, Ga. He also had observed the operation of a similar machine in Kansas City. In his opinion, "it would be possible to operate it by several methods other than electrical and provide the essential functions," because the end result is accomplished mechanically, achieved through rotary power inputs; if nonelectric features were substituted for electric features, it would not be necessary to make substantial modifications to the structural parts of the machine because the driving means was separate from the machine.

The witness had prepared three pages of a series of "block diagrams" (plaintiff's collective exhibit 6), showing the system presently in use, and also possible substitute mechanical and hydraulic systems. He explained with the use of the diagrams how other power could be used in place of electric power to operate the machine, such as hydraulic, internal-combustion engine, gasoline, diesel, or steam.

The mechanical, hydraulic, and driving schemes set forth by him on sheets 2 and 3 of plaintiff's collective exhibit 6, he admitted, on cross-examination, were merely creations of his mind, never having converted a machine in such manner. He stated that he was not prepared to estimate the cost of such a conversion. Sheet 1 is designated as a sketch of a BM 163 1S envelope machine, a machine similar to the imported machine herein. apparently with nine motors, or the main drive motor with its pilot motor, and seven others. All of the seven motors could be "replaced by the combination of line shafting and belt take-ups, as shown in sheet 2."

Roger E. Sotti, president and general manager of the Southeastern Envelope Co. for the past 7 years, mechanical engineer, holder of a bachelor of science degree, Georgia Tech., 1945, purchasing agent and chief adjuster of the envelope machinery units for the company, having been subpoenaed by the defendant, testified for the defendant as follows: His company is engaged in the business of making and selling envelopes; he is personally familiar with the machine involved herein, in fact, the instant machine, the Helios 129 DS, is at his plant, under his personal supervision and responsibility; he is familiar with its structure and method of operation.

In his opinion, the said machine could be converted and operated by power other than electricity, such as steam, gas, hydraulic, air, but it would not be possible to substitute nonelectric features for the electric features without substantial modification of the machine itself. He stated that he was familiar, from his experience, as to what would have to be done to convert the machine, for instance, to steam or gasoline; that it would require a substantial modification as to the source of energy.

He first outlined steps necessary to convert the Helios 129 DS to gasoline power. From a technical standpoint, to eliminate all unnecessary electrical features from the machine, would require changes in switches and in gears within the machine itself; the original source of power, other than electric, would have to be located somewhere other than the immediate vicinity of this particular machine, which happens to be using aniline or alcohol, a combustible material for printing. Gasoline power, he thought, would present a more dangerous con-

dition than electricity and transmitting this gasoline motor power would be through a series of pulleys.

He said he is familiar with costs in the machine industry and, in his opinion, the cost of modifying, of converting the machine at bar from electric to gasoline power, would be in excess of $10,000; conversion to steam power would cost approximately the same; air and steam power are not synonymous, they are two different things, he said, and to convert to air power, the cost would be prohibitive—on this particular machine, in excess of 60 or 70 thousand dollars, or more than the original cost of the machine itself.

Asked how he arrived at the figure of $10,000 for converting the machine to gasoline or steam, he stated that they once had thought of operating two or three machines with steam power. He "had looked into and investigated the possibility of using a steam turbine versus gasoline turbine versus electrical energy" and found that the cost of purchasing the equipment was not warranted, and so stayed with the "public utilities."

In response to questions from the court, the witness stated it would cost between 4 and 5 thousand dollars, exclusive of the cost of motors, to convert the involved machine to gasoline power so that it would operate efficiently. Itemizing such estimated costs as he could think of without a thorough study, he itemized and arrived at a figure totaling approximately $3,000. He said that his earlier conversion cost figure of $10,000 included motors. Asked to break down the cost figures, he began by stating that he is a person supposed to know and estimate the costs to repair a machine, or to replace and redesign one, because, in his experience, he had built machinery. He said it would take him 2 days to plan what had to be done and what would not need to be done to convert the machine from electricity to gasoline.

He said the basic cost of conversion to gasoline power would be approximately the same as to hydraulic power; a gasoline-powered machine purchased from the manufacturers would cost slightly more than the electrical unit. In effecting the change, the witness continued, first would be the problem of starting and stopping the machine, disengaging it from the original source of energy, which would require about $1,000; a blower fan to dry the glue, V belts, holders, and pulleys included, about $300; a heat blower suction combination, about $300; a series of vents, requiring sheet metal work, about $300; replacing pump with gear-driven actuaries, two at $21 each; holders and steel to actuate, about $50; labor about $25; main drive for the machine, if the engine is sitting on back of the machine, roughly $1,000, if sitting near the drive shaft, about $500; electrical units on this machine could be removed or allowed to remain; changing the counter, about $50; change of dripolators, $5 or $10, or cheaper if done by gears; these parts are presently attached to the machine. He stated that three start and stop levers at $300 each included clutches, brakes, or links, and would cost approximately $900; $100 for a gear, shaft, and holder to activate the counter.

With these changes, it would still be an envelope-making machine essentially, but not as efficient as the electrical unit, the witness stated.

The court again inquired of the witness, Sotti, to explain the discrepancy between his estimate of 4 or 5 thousand dollars as the conversion cost and Mr. Lenk's estimated cost of roughly $200, pointing out that somewhere lay major—not minor—differences in their thinking. The witness, Sotti, admitted that their estimates should not be so far apart. He pointed out further conversion changes not indicated by Mr. Lenk's testimony. He stated that starting and stopping the machine would be a costly matter. Under normal circumstances, three start and stop levers at approximately $300 per lever would be required, including clutches, brakes, or links. A blower motor, costing approximately

$300, would be needed, and would include a series of pulleys and belts attached to the main drive shaft for normal air circulation; a vent with another blower, pulleys, and belts to substitute for the present hot air heater would cost $300; to utilize existing power through a series of pulleys and belts or gears or other means to activate the ink pumps, would cost approximately $1,000; the electrically operated counter, which counts the envelopes, could be replaced by a mechanical operation, costing between approximately $75 and $100. His figures included the cost of labor and, up to this point, approximated a total of $3,000 as against his earlier estimate of $4,500. This was the best he could do without more study, he stated.

The court recalled the witness, Mr. Lenk, with a view to clarifying the testimony on the cost of converting the imported machine for gasoline or other types of power, and to review his estimate of $200. Lenk stated that he did not consider the $900 cost of three stop and start levers, on the assumption that the substitute gasoline engine would be a drive package, an engine which would include within itself means of starting and stopping, thus obtaining varying speeds. Concerning two blowers, which Mr. Sotti estimated would cost $600 in a conversion, he did not consider them because they would not cost "significantly more" than the present electric motor unit. The existing vent pipe could be modified at a cost of $10 to $15. In his earlier estimate of $200 for conversion of the machine, he took into consideration the pulleys and belts which Mr. Sotti estimated would cost $1,000 but did not take into consideration either the main drive, the prime mover, and its associated starting and stopping equipment. Concerning the substitute gas-fired heater to dry the gum, the difference in cost from the quartz lamp heater would be "probably on the order of $300." A compressed air link pump to replace the present pump would not exceed $25. Concerning replacement of the electrical counter with a mechanical counter, he stated that Mr. Sotti's estimate of $100 is probably "about right." He now reiterated that his estimate of $200 included merely transferring motive power to certain of the units now driven by electric power. He estimated that approximately $300 would be the cost for a different type of heating, and that, based against a cost of $42,500 for the machine, his total of $500 for conversion would not represent a substantial change. To the court's question of "How much money would you have to spend, for example, to regard it as being substantial?" the witness stated: "* * * a design change which would involve an expenditure of—even of 3 to 5 thousand dollars * * * would be certainly justified."

The envelope machine in the case at bar and the pertinent paragraphs of the Tariff Act of 1930, as modified, *supra*, namely, paragraphs 353 and 372 (19 U.S.C. § 1001, pars. 353 and 372), lead us to certain earlier cases and established precedents on the subject here involved.

The first case coming to our attention which has law and language bearing importantly upon the present controversy is *Keer, Maurer Company* v. *United States*, 48 Cust. Ct. 205, C.D. 2336. Other cases, closely pertinent, are cited therein.

The *Keer, Maurer* case, *supra*, involved a somewhat similar situation. There, the window-envelope machine was a Helios Rotary Window Punching and Patching Machine, Model 31 J, imported from Germany. Apparently, it was manufactured by the same manufacturer as in the instant case. The functional operations were much the same. The size of the machine, however, was not disclosed by the record, but the only witness testified that, with a modification requiring 3 or 4 hours of labor and an expense of some $15, the said machine could be enabled to operate by other than electrical power, such as gasoline.

steam, or diesel engine. Accordingly, the court held that the machine was not essentially an electrical machine within the contemplation of paragraph 353—

It appearing from the record that the electrical features of the machine could to some extent be disregarded and, in other respects, substituted by nonelectrical power without substantial modification or reconstruction of the functional operation of the machine * * *. [P. 205.]

This language reads like that needed for application to the facts in the instant case. However, further facts of record in the case at bar, and other related cases, warrant examination for factors which may distinguish the *Keer, Maurer* case, *supra.*

The plaintiff, in citing the *Keer, Maurer* case, *supra,* concedes, in its brief, that there is a difference between that machine and the instant machine, "the present machine has more electrical equipment * * *," urging that the difference is one of degree only. This degree of difference and extent of modification, however, are not elaborated sufficiently enough therein to satisfy our necessarily greater inquiries in the instant case. Significantly, too, the court, in that case, stated:

It may be noted, however, that the witness stated he had never seen the machine used with other than electrical power, nor had he ever known of its being used differently.

Wherefore, the estimate that modification and power conversion could be accomplished there in 3 or 4 hours for approximately $15 on a machine whose dimensions concededly differ from the machine at bar, appears of scant aid in the instant case on the issue of substantial modification.

Cited in the said *Keer, Maurer* case is *United States* v. *Dryden Rubber Co.,* 22 CCPA 51, T.D. 47050. The article imported was a machine for slicing sponge rubber cake. It was accompanied by two electric motors, one of which supplied the motive power for the machine, and the other motor powered two small emery wheels used to sharpen the cutting blade. The court, in holding that it was not a machine with an essential electrical feature classifiable under paragraph 353, *supra,* stated:

The crux of the decision in determining whether a machine is within the language above quoted, is expressed in the following statement of the court:

* * * The electrical feature must be an essential feature, without which the article will not function, normally, for the purposes intended, * * *.

In other words, if an article has been designed to be operated by electrical power, and cannot normally function otherwise, it is an article with an essential electrical feature, within the scope of paragraph 353. If, however, the substitution of nonelectric features for the electrical ones can be made without substantial modification or reconstruction of the functional properties of the machine, it is not an article having as an essential feature an electrical element or device, within the meaning of said paragraph 353. * * *

See also *Ralph C. Coxhead Corp.* v. *United States,* 22 CCPA 96, T.D. 47080; *W. C. Sullivan & Company* v. *United States,* 46 Cust. Ct. 31, C.D. 2229.

In reaching its conclusion in the *Keer, Maurer* case, *supra,* the court stated that it had considered the *Dryden* and *Coxhead* cases, *supra,* but also was influenced largely by a more recent case of our appellate court, *United States* v. *Baker Perkins, Inc., R.F. Downing Co., Inc.,* 46 CCPA 128, C.A.D. 714. In that case, involving a cocoa liquor grinding mill intended to employ an electric motor to power the machine, that being regarded as the most practical and commercially economical mode of operation, the court held that since it was shown that the mill could be operated by other than electrical power, selection of an electric motor did not make the grinding mill an essentially electrical

article. See also, *Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls, 273, T.D. 37537; and *United States* v. *J. E. Bernard & Co., Inc.*, 30 CCPA 213, C.A.D. 235.

From *Frank P. Dow & Co., Inc., and Evergreen Distributors, Inc.* v. *United States*, 52 Cust. Ct. 235, 237, Abstract 68234, we read:

\* \* \* it follows that if the article, when it is imported, is designed and constructed to use electrical power, or other power, interchangeably, then it has not, as an essential feature, an electrical element or device.

Returning to the facts in the instant case, we take cognizance of certain salient facts established in the record, to wit, that the machine in the case at bar could be operated by electric motor power, or by gasoline, diesel, steam, gas turbine, and, possibly, other types of motive power. The record establishes clearly that conversion to power other than electric may be accomplished interchangeably. Thus, this would render the electrical feature of the instant machine nonessential, and, therefore, place it outside the purview of paragraph 353 of the Tariff Act of 1930, as modified, *supra*.

However, pursuing further pertinent language in the *Frank P. Dow Co.* case, *supra*, we quote:

Where such an article can utilize electrical power or other power interchangeably, the question of whether any modification of the machine *per se* is necessary to accomplish this must be considered. In the event that substantial modification or reconstruction is necessary, said machine, if electrically operated, would remain within the purview of paragraph 353, as modified.

This brings us to the basic issue in the instant case, whether it would require substantial or minor modification or reconstruction of this machine, *per se*, to convert it from one electrically motivated to one motivated by power other than electricity. The extent of such a conversion sometimes, as in the instant case, must be determined from a hypothetical situation from the testimony of expert witnesses, since an actual conversion has never taken place according to the testimony herein. Estimated figures as given by said witnesses are understandably approximations. Conversion to a gasoline-powered motor was the exemplar in the instant case. There is no set figure for guidance as to what would constitute substantial or minor modification. Involved in making such a determination are such elements as cost of materials, possible substitute parts, labor, time, and, *inter alia*, possibly that the imported machine, after such conversion, shall remain reasonably suitable to perform its normal intended function with reasonable efficiency.

The plaintiff has the burden of proof to establish by evidentiary facts that the aforesaid conversion would not require substantial modification or reconstruction; otherwise, the collector's classification of the machine under paragraph 353 of the tariff act will prevail.

The *Dow* case, *supra*, involved this issue. The imported merchandise consisted of a gangsaw which could use various sources of motivating power interchangeably. There were also at least two other functions of the imported machine which required electricity, but because the prime power sources were interchangeable, we infer that the machine would not have been deemed within the purview of paragraph 353 as "articles having as an essential feature an electrical element or device," if there had been evidence in the record to show that minor modifications might have effected a conversion from electrical to another power source. However, lack of evidence indicating what modification would be necessary to accomplish such conversion left the imported gangsaw within the purview of paragraph 353, as modified, *supra*.

452

In view of certain pertinent language set forth in the said *Dow* case, further factors must be considered. At page 238, the court stated:

Under the above test in the *Dryden* case and following a similar situation as was involved in *United States* v. *Baker Perkins, Inc.,* et al., 46 CCPA 128, C.A.D. 714, the machine involved herein is not one which fits within the purview of "articles having as an essential feature an electrical element or device," since the prime source of power is interchangeable *without substantial modification.* [Italics supplied.]

The words "without substantial modification" engage our attention, particularly in the light of the testimony given by two witnesses for the plaintiff and one for the defendant on this point, which comprise the issue of substantiality.

In estimating the extent and cost of the aforesaid conversion, plaintiff and defendant are at wide variance. We are, of course, aware that any figures given by the witnesses are only approximations, but even differing approximations should be more reasonably in line to afford some probative value. Plaintiff's witness, Mr. Lenk, gave a first estimate of $200, and defendant's witness, Mr. Sotti, gave an estimate of 4 or 5 thousand dollars, as the cost of converting the electrical machine at bar to another source of power.

On this score, the testimony of the second witness for the plaintiff, Mr. Johnson, may be largely discounted, particularly in view of the fact that he admitted that he was not prepared to estimate the cost of conversion. To the court's query whether he would go along with Mr. Lenk's conversion estimate of $200, he stated that he had not made a study and did not know. His testimony, therefore, offers little probative aid on the issue. His opinion, therefore, that substantial modification would not be required constitutes a mere unsupported conclusion, according to his own admission.

Remaining, therefore, is the task of accounting for the wide discrepancy in the cost estimates of the two opposing witnesses and of determining just what changes would be necessary in the machine *per se.*

There would be no problem here, if we were to accept the statement of the first witness, that the modification would be minor and cost about $200, plus later additions. However, it becomes apparent that this first figure was palpapbly understated when we consider that the substitute gas-fired heater alone would cost over $300, plus labor. How much more is not clear, since this estimate is given as a "difference in cost" between the present quartz lamp unit and the gas-fired unit.

It would be difficult to accept the estimation of the witness concerning other changes also enumerated, and time and labor costs, for instance, that an average mechanic could remove the electrical components and install their replacements in 1½ days. Bearing in mind the dimensions of this electrical machine, its 10 motors, its obvious complexity, the recognizable high cost of labor and materials, it seems more feasible to accept the statement of the opposing witness that it would take about 2 days just to plan any necessary structural changes, This is indicative and impressive of substantiality of modification. It is the testimony of a well-qualified expert also.

It is noted that the conflicting estimates herein are given by two well-qualified witnesses. Mr. Sotti, a mechanical engineer, president and general manager of the company owning the machine at bar, stated that he was personally responsible for its operation and maintenance. In fact, he had studied at one time the feasibility of converting to gasoline or other power other than electric, but found that the cost of purchasing the equipment would not be warranted. In his opinion, the said machine could be converted to power other than electricity, but not without substantial modification of the machine itself.

From the foregoing estimates and from all the attending related elements, a determination must be made as to whether conversion of the electrical machine to another source of power would entail "substantial" modification.

We are at this point, therefore, lacking conclusive evidence as to what modification of the machine *per se* is required or the minimum cost of conversion. Further to this, the extent of whatever would constitute necessary modifications is at variance among the witnesses. This situation can be appreciated readily enough when we recall that all three witnesses herein testified, in substance, that they had never accomplished such a conversion, and had never seen or known of such a conversion.

This court, seeking some firm base on which to arrive at its determination, finds in the conflicting and varying cost estimates, and in the probable extent of necessary machine modifications, a situation which is at least conjectural.

Since "substantial modification" is itself a relative expression of no precise measurement, this court finds itself unwilling to accept as adequate the estimates and opinions of the opposing parties hereto. To base a determination of either minor or substantial modification on the estimates and opinions as now of record, would be to base one conjecture upon another. Accordingly, the record lacks sufficient convincing reliable evidence on the issue of modification or reconstruction of the functional properties of the machine.

Therefore, based upon the entire record herein, and upon our analyses of the cases cited, *supra*, and, to the extent pertinent hereto, upon the case of *Frank P. Dow & Co., Inc.*, *supra*, it is the opinion of this court that plaintiff has failed to establish by adequate reliable proof facts sufficient to form a basis for judgment in its favor on the issue of substantial modification of the imported machine. Accordingly, the court takes reliance on the presumption of correctness attaching to the collector's classification.

The protest claim of the plaintiff is, therefore, overruled and the classification of the collector is affirmed.

Judgment will be rendered accordingly.

### Concurring Opinion

Rao, Chief Judge: For the reason that I am of opinion that the record in the instant case is insufficient to establish the degree and extent of the structural changes which must be made to the machine in issue in order to convert it to function with nonelectrical motive power, I concur in the conclusion reached by my esteemed colleague in this case.