(C.D. 3125)

GENE MILLER
ATWOOD IMPORTS, INC. } v. UNITED STATES

United States Customs Court, Second Division

(Decided September 20, 1967)

*Glad & Tuttle* (*Robert Glenn White* of counsel) for the plaintiff.
*Carl Eardley*, Acting Assistant Attorney General (*Sheila N. Ziff* and *Brian S. Goldstein, trial attorneys*), for the defendant.

Before RAO, FORD, and BECKWORTH, Judges

BECKWORTH, Judge: The merchandise involved in this case consists of woodworking machines of different types with electric motors imported from England or West Germany and entered at the port of Los Angeles on various dates in September, October, and November 1962. The machines and motors were assessed with duty as entireties at 12½ per centum ad valorem under paragraph 353 of the Tariff Act of 1930, as modified by Presidential proclamations, 97 Treas. Dec. 157, T.D. 55615, and 97 Treas. Dec. 430, T.D. 55649, as articles having as an essential feature an electrical element or device. It is claimed that the machines are properly dutiable at 10½ per centum ad valorem under paragraph 372 of said tariff act, as modified, as woodworking or other machines, not specially provided for, and that the electric motors themselves are dutiable under paragraph 353 of said tariff act, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, as motors of more than 1/10 horsepower but less than 200 horsepower.

The pertinent provisions of the said tariff act, as modified, are as follows:

Paragraph 353, as modified by T.D. 55615 and T.D. 55649:

Articles having as an essential feature an electrical
  element or device, such as * * *, finished or un-
  finished, wholly or in chief value of metal, and not
  specially provided for:

  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;
   Other (* * *)_____ 12½% ad val.

Paragraph 372, Tariff Act of 1930, as modified by T.D. 55615 and T.D. 55649:

Machines, finished or unfinished, not specially provided for:

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

Sawmill and other wood-working machines (except reciprocating gang-saw machines)_ 10½% ad val.

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

Other (except * * *; sawmill and other wood-working machines; * * *)_____ 10½% ad val.

Paragraph 353, as modified by T.D. 54108:

Articles having as an essential feature an electrical element or device, such as * * *, finished or unfinished, wholly or in chief value of metal, and not specially provided for: .

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

Motors:
Of more than 1/10 horsepower but less than 200 horsepower_____ 10½% ad val.

Plaintiff claims that the case of *Supreme Woodworking Machine et al.* v. *United States*, 54 Cust. Ct. 368, Abstract 69204, is controlling of the issues herein. The evidence in that case was summarized by the court as follows (p. 369):

The testimony of Mr. Stone, president of plaintiff corporation, established that the imported machines were operated from a power source by means of V or flat belts; that the source of power in each instance was a standard electric motor, produced in accordance with NEMA, National Electrical Manufacturers Association, specifications; that, in each instance, the motor could be used for many other purposes; that each machine as imported contained such a motor, except exhibit 8, which contained two of such motors, which were bolted to the machine by the use of three or four bolts; that the motors were easily subject to removal by unscrewing the three or four bolts holding the motor and attaching the belts to any other source of power, such as water, steam, or diesel; that, in addition thereto, the machines contained an on-off switch with wiring to the electric motor; that this on-off switch controlled the starting and stopping of the machine; that the machines had no other electrical feature.

The court held, following the principles set forth in *United States* v. *Dryden Rubber Co.*, 22 CCPA 51, T.D. 47050, and *United States* v. *Baker Perkins, Inc.*, et al., 46 CCPA 128, C.A.D. 714, that the woodworking machines and their accompanying motors did not have as an essential feature an electrical element or device within the meaning of paragraph 353 and that the machines and motors did not constitute an entirety and should have been appraised separately.

The cases cited by the court enunciated the principle that if the imported article is designed and constructed to use electrical power or other power, interchangeably, it does not have as an essential feature an electrical element or device, but that if the article is so constructed as to utilize electrical power solely, it does have as an essential feature an electrical element or device.

In *Ralph C. Coxhead Corp.* v. *United States*, 22 CCPA 96, T.D. 47080, the court stated (pp. 101–102):

\* \* \* We think Congress, by that term, meant that the motor or the electrical feature of the article must be essential to the operation of the article and that if the article was so designed and constructed that it could normally operate in two ways, both by electrical power and by hand power, interchangeably, it would not be an electrical article and the electrical element or device would not be an essential element or device. If, however, the article was so designed and constructed as to be operated normally by means of the electrical element, the fact that it might be operated by hand in emergencies or at such times as when the motor would be broken or out of repair, would, in our opinion, not destroy its inherent electrical character and remove it from the paragraph. The motor would not be an essential element of a calculating machine if the machine as imported was so designed and constructed that it might, without substantial modification, be interchangeably operated by hand or by electrical power. [Emphasis quoted.]

The *Baker Perkins* case, *supra*, held that the fact that the use of sources of power other than electricity would not be practical from a commercial standpoint was not controlling in view of the fact that the condition of the machine did not limit the drive to an electric motor.

The Government has conceded in its brief in this case that the woodworking machines are capable of use with sources of power other than electric, but claims that such other sources of power could not be substituted for the electric motors without substantial modification or reconstruction of the machines.

With the issue thus narrowed, we turn to the evidence presented. This consists of the testimony of one witness and three documents depicting some of the machines involved.

The witness was Milton E. Gray, who is a mechanical engineer and has a bachelor of science degree. He has been a member of the American Association for Contamination Control, the Woodworking Machinery Dealers Association of America, American Society of Testing Materials, and the American Tool Society. He has been a business administrator and executive for 20 years and has also served in an engineering capacity in his own firms. He is sole stockholder of Atwood Imports, Inc., the importer herein. On behalf of that firm the witness visits trade shows, factories and installations in Europe each year and imports woodworking machinery on the basis of its adaptability to

American methods. He was familiar with the merchandise involved herein and stated that he had gone to training programs as comprehensive as actually tearing a machine down and rebuilding it, and that he had the sole responsibility in the United States to see that the equipment was kept operating. He not only purchased the merchandise but saw to it that repair parts were available so that no customer would be out of business for more than a few days.

The witness said that the dimensions of the machines involved herein varied from 8 by 12 by 24 inches up to a floor coverage of 5 by 8 feet and standing 10 feet high. Two of the machines, the Rye PD/3 drilling unit and the Frommia electric feed unit are portable in the sense that they are easy to pick up and mount as an accessory. All of the machines were imported with electric motors, but Mr. Gray testified that they could have been purchased without them.

For the sake of clarity, the different machines involved herein will be discussed separately.

The Rye Type R–72 automatic shaping machines are made by the Rye Engineering Company in England, and the two involved here differ only in that the shaping heads are of a different horsepower. They are used to shape things such as chair arms, seats, captains' chairs, back rails, and anything which has a shape and has to be cut out. They are very fast, high production machines. Plaintiff's exhibit 1 illustrates and describes one of them. It has a rotary table driven by an electric motor which is attached to the side by four bolts. Motive power is transmitted to the machine through a timing gear chain or rubber belts. The actual cutting heads are two separate motors with spindles adapted to fittings on various types and shapes of cutter heads. These motors are also bolted on with four bolts.

According to the witness, it would be possible to remove the electric motors and use other power such as a steam engine or a gasoline engine to drive the machines. The electric motor could be removed by taking out the four bolts which attach it to the machine. The next step was described by the witness as follows:

If you used a long belt suitable to get out to the shaft or whatever other means of power you were using, you would just use the same V-belt shaft. If you were going to individually power it with, say, a gasoline engine you probably would put the gasoline engine up as close as the physical limits would permit you and then again belt with whatever belting was available.

The electric motors in the shaping heads could also be removed by taking out four bolts and another source of power utilized by attaching a pulley to the cutting head shaft and running a drive belt to the line shaft source of power. The cutting heads would still run at 9,000 r.p.m. The control panel would be modified and a clutch introduced on

the line shaft to interrupt the power. The panel would not have to be removed or drilled into.

These operations would not require any modification of the woodworking machine itself and it would function normally with another source of power.

The witness explained that a line shaft is a long drive shaft which has pulleys at intervals along its length and power is transmitted by pulley belt, V-belt, or cog belt, from the line shaft to a given machine. The line shaft may be powered by a water wheel, a steam engine or a gasoline engine.

The witness said that the basic design of the R–72 machines goes back to 1850. Some were actually designed for hand-foot treadle operation. As electrification came about, it became more convenient and less expensive to motorize these machines. There are still some shops in Los Angeles that run off line shafts but they are considered antiquated. The imported machines, however, were designed for world trade and many countries do not have electric power and are forced to use steam or gasoline engines with V-belts and pulleys. The witness said that the R–72 had been sold to countries where that had been necessary and that he had seen some, which were to be driven off a line shaft, being readied and crated for shipment to Africa.

This machine would not normally be sold or used in the United States for utilization of a source of power other than electricity for reasons of convenience and economy. According to the witness, this machine is used by the furniture trade which can afford to put in power plants even where there is no electrification.

The Rye Type PD/3 drilling unit (exhibit 2) is a single spindle boring machine which has a self-activated cylinder in it that advances and retracts so that it can be set up in various attitudes and holes driven simultaneously. It has an electric motor mounted by means of four bolts and motive power is transmitted through a train of gears. The motor could be removed by taking off the four bolts and another source of power substituted by putting a pulley on the end of the shaft from the gear train. This would not require any modification of the drilling unit itself and the machine would function normally for the purpose for which it was intended. This machine is portable to the degree that it is normally affixed to some type table or jig stand. It can be picked up in the hand. The change of source of power would not restrict the area of use because in every instance the only movement is an automatic spindle which advances and recedes which is quite independent of the drive.

The witness said that he had seen prototype machines designed in the early 1900's that were run off a belt.

The Frommia automatic feed unit, model 850 (exhibit 3), made in Germany, is a power-feeder which automatically feeds lumber or material into table saws, bandsaw shapers, or other cutting machines without risking the operator's hands and saving blade wear through smooth action. The motive power is transmitted from an electric motor through a train of gears. The motor could be replaced and another source of power substituted by extending the shaft which connects the motor to the gear train about 2 inches and mounting a pulley on it. This would involve ordering the shaft that way from the factory. In that case, the manufacturer would simply cut the stud in which the pulley was mounted a little bit longer leaving it extend out. This would not require any modification of the machine itself and it would function normally with the other source of power. The witness said, however, that he had never seen or heard of this machine being used in the United States other than with electric power.

The Brookman automatic gluing and assembling machine is a machine used primarily to dovetail drawers. It puts a dovetail on the end, automatically sets up the glue, presses the pieces together, and the drawers come out at a rapid rate. It has an electric motor attached to the machine with four bolts. The motive power is transmitted through pulleys and belts. Other motive power could be used by substituting longer belts and pulleys that would reach and connect with a line shaft or gear shaft. No modification of the gluing and assembling machine would be necessary and it would continue to function normally.

The Stenner band resaw type VHM 36-inch machine is used for sawing either very large timbers 12 by 12 or 16 by 16, or logs up to 18 by 20 inches in diameter by means of a heavy driven carriage. The machine feeds the timber through the bandsaw plate and splits it down into sections of any desired width. It is a heavy machine weighing some thousands of pounds. According to Mr. Gray, it is similar to the Wadkin electrically driven 30-inch bandsawing machine which was involved in the *Supreme Woodworking* case, *supra*, except that it is much heavier.

The electric motor for the Stenner band resawing machine, being large enough to stand by itself, is normally placed in a concrete prepoured mount bolted to a heavy cast base or welded. It is not physically attached to the machine. Mr. Gray believed that the motor for the machine involved here, being only 15 horsepower, was mounted on a Weldman bracket, connected to the machinery by bolts. The motive power is transmitted through belts.

The witness had seen such machines in England operated with gasoline engines for motive power. In order to use this source of power,

he said it would be necessary to replace the pulley with a bigger one to get a different speed ratio. The witness explained :

A. There is a pulley on the end of the shaft that carries the main band-saw wheel, and that pulley is selected for diameters so that it matches whatever motive power. Normally in an electric motor it will be either 1,800 or 3,600 r.p.m., and an 1,800 r.p.m. motor, electric motor, they would select the driver and driven pulley to give the band-saw its correct speed in feet per minute. If you use the gasoline engine, which might be only turning at six to nine hundred r.p.m., you will have to increase the diameter of the pulley on the gasoline engine shaft to give it the same speed.

Q. To increase the diameter of the pulley what do you do?—A. Pour another casting and machine it if it isn't a stock item, but most of these pulleys are stocked by any power drive company.

The witness said that there are two pulleys—one on the motor and one attached to the machine—and that they are connected by belts, and that either one, or both, could be replaced. The machine would function normally with another source of motive power and no modification of the woodworking machine itself would be necessary. According to the witness, the Stenner band resaw is utilized with other than electric power in many mills in Oregon and Washington where they still use line shafts.

Plaintiff claims that this evidence establishes that the electric motors attached to these machines could easily be removed; that other power could be substituted by the use of pulleys leading to the source of such power or by putting a pulley on the end of the existing gear train shaft, or substituting a longer shaft; that in no instance would there be any modification of the machine *per se;* that in all instances the machine would function normally with the other source of power.

Defendant emphasizes testimony to the effect that these machines are not sold in the trade or used in the United States with other than electric motors; that the introduction of pulley systems, clutch handles, and shafts indicates that the machine must undergo substantial modification if it is to be operated by other than electric motors; that the record does not establish the cost of making the change, nor the labor required.

It has been held in many instances where an electric motor could be removed by taking out bolts and another source of power substituted by the use of pulleys and belts, that the electric element or device was not an essential feature. *Henry A. Wess, Inc.* v. *United States,* 43 Cust. Ct. 78, C.D. 2107; *Keer, Maurer Company* v. *United States,* 48 Cust. Ct. 205, C.D. 2336; *Frank P. Dow Co., Inc., et al.* v. *United States,* 52 Cust. Ct. 235, Abstract 68234; *Henry A. Wess, Inc.* v. *United States,* 52 Cust. Ct. 303, Abstract 68403; *J. J. Gavin & Co., Inc.,*

*et al.* v. *United States*, 54 Cust. Ct. 414, Abstract 69266; *F. B. Vandegrift & Co., Inc.* v. *United States*, 56 Cust. Ct. 46, C.D. 2610; *Arnhold Ceramics, Inc.* v. *United States*, 56 Cust. Ct. 416, C.D. 2668; *Consolidated International Equipment & Supply Co.* v. *United States*, 56 Cust. Ct. 442, C.D. 2671.

In the first *Henry A. Wess, Inc.*, case, *supra*, the merchandise as imported consisted of woodworking belt-driven machines with electric motors attached. Other power could be substituted by removing the motor, unscrewing the four bolts by which it was attached, and detaching the belt from the source of power to the driving pulley on the machine. The variation in speed occasioned by the use of another source of power could be compensated for by varying the diameter of the pulley on the source of power supply without any change of the pulley on the woodworking machine.

In the *Vandegrift* case, the merchandise consisted of apple pressers with two electric motors. Motor "A" transmitted power by means of a chain and sprockets to the apparatus; motor "B" turned the conveyor through a clutch assembly. The former could be removed by taking out four bolts and uncoupling the chain, removing the sprocket on the motor shaft, and replacing it by some other kind of a motor driven shaft. Motor "B" could be replaced by removing four bolts, removing the shaft of the clutch from the motor shaft, and replacing it on another shaft. These operations, according to the witness, would take about an hour each. The witness had never seen such machines operated other than by electric power.

The *Keer, Maurer* case involved a machine used in manufacturing window-type envelopes. To operate it electrically, two electric motors were added; a main drive motor located on the factory floor was connected to the machine by means of flexible V rubber belts, and a vacuum pump motor adjacent to the machine, bolted to its conventional base and attached to the vacuum pump by a coupling of parts, was connected to the operating parts of the machine by means of four vacuum pipe lines. The witness testified that the machine could be modified by a mechanic or maintenance man so that it could be powered by a gasoline, steam, or diesel engine. Three or four hours of labor and an expenditure of $15 would be required.

In the second *Henry A. Wess* case (52 Cust. Ct. 303, Abstract 68403), the electric motors supplied power through V-belts to the machines and another source of power could be readily substituted by a change in length of the belts and different pulley ratios. Electricity was used because it was cheap and convenient.

The gangsaws in *Frank P. Dow Co., Inc., et al.* v. *United States*, *supra*, performed several operations which utilized electricity. The evidence established that the source of power for the primary func-

tion could be an electric motor, a diesel engine, or a steam engine, and that merely connecting the V-belts to any of these sources of power would enable power to be delivered to the machine without any modification of the machine *per se*. The court indicated that had it not been for the other electrically operated features, it would have held that the machine was not an article having as an essential feature an electrical element or device.

In *Brown Boveri Corp. et al.* v. *United States*, 58 Cust. Ct. 131, C.D. 2905, it was held that the involved bearings which were parts of an isotherm compressor were not parts of an article having an electrical element as an essential feature. There was evidence that between 1954 and 1958 the compressors had been installed with motor power units but that since then turbines were used. A conversion from one application to the other did not involve any modification of the compressor which was coupled to the power source by means of a flexible coupling. The conversion involved only a change in the supporting foundation for the power unit at a cost of about $10,000 as against an overall cost for acquisition and installation of about $200,000.

On the other hand, in *Berkley Machine Company* v. *United States*, 55 Cust. Ct. 444, Abstract 69577, it was held that an envelope-making machine operated by 10 electric motors was an article having an electric element or device as an essential feature. One witness testified that it would be possible to operate the machine by other means than electricity by replacing the motors with other sources of power, such as diesel, gasoline, turbine, or steam. He said the modifications would be minor and that they could be carried out by a good mechanic at a cost of $200. Other witnesses testified that the conversion could be made, but at much greater cost—up to 4 or 5 thousand dollars. In discussing whether the modifications required were substantial or minor, the court said that factors such as cost of materials, possible substitute parts, labor, time, and the subsequent efficiency of the machine should be considered. The court held that the record lacked sufficient convincing, reliable evidence on the issue of modification to support the claim that electricity was not essential. It stated, in the course of the opinion (p. 452) :

It would be difficult to accept the estimation of the witness concerning other changes also enumerated, and time and labor costs, for instance, that an average mechanic could remove the electrical components and install their replacements in 1½ days. Bearing in mind the dimensions of this electrical machine, its 10 motors, its obvious complexity, the recognizable high cost of labor and materials, it seems more feasible to accept the statement of the opposing witness that it would take about 2 days just to plan any necessary structural

changes. This is indicative and impressive of substantiality of modification. It is the testimony of a well-qualified expert also.

It is noted that the conflicting estimates herein are given by two well-qualified witnesses. Mr. Scotti, a mechanical engineer, president and general manager of the company owning the machine at bar, stated that he was personally responsible for its operation and maintenance. In fact, he had studied at one time the feasibility of converting to gasoline or other power other than electric, but found that the cost of purchasing the equipment would not be warranted. In his opinion, the said machine could be converted to power other than electricity, but not without substantial modification of the machine itself.

In *United States* v. *Baker Perkins, Inc., et al., supra*, a machine used to grind cocoa nibs occupied a floor space of about 4½ by 6 feet and was about 9 feet high. A V-belt drive connected the mill to a prime mover through the usual pulleys. In that case, the importer intended to use an electric motor. The machine could, however, be powered by a steam engine, a diesel engine, or a gasoline motor. The court held (p. 131):

* * * We cannot agree with the conclusion below that the electric motor by which appellees' mill is driven makes it essentially an electrical article. It was a grinding mill having a drive shaft to which a pulley was attached. Any source of adequate power connected to that pulley to rotate the shaft would run the machine. Except for practical and commercial considerations, in the operation of a chocolate factory in a given location, the power source would be immaterial. Selection of an electric motor did not make the grinding mill an essentially electrical article. * * *

Many of the elements of modification in the instant case are found in the cited cases which held that the particular machine involved was not essentially electrical: Removal of an electric motor by unscrewing four bolts, the use of pulleys of other diameters, replacing a shaft, changing in length of belts and different pulley ratios.

The only witness who testified in this case, who was a mechanical engineer and thoroughly familiar with the machines, testified that other sources of power could be substituted for electric power, that the machines would function normally with such other power and that no modification of the machines themselves would be required. In answer to a question as to what other sources of power could be used, he testified:

The line shaft would be the most direct and it could be powered by anything that would rotate the line shaft at the right speed and the right horsepower.

A careful analysis of the witness' description of the necessary modifications indicates that most, if not all, the changes were made outside the machines by the use of pulleys and shafts connecting the substi-

tuted source of power with the machines. In the case of the R-72 automatic shaping machines, the only modification of the machines was in the control panel and by the introduction of an auxiliary handle on the side. In the case of the Stenner band resaw, a pulley with a larger diameter would have to be substituted which, according to Mr. Gray, could be purchased either from stock or could be cast and machined on order. The band resaw itself would not be modified. In the case of the Frommia automatic feeding unit, the witness testified:

Q. What would this process involve, removing the shaft you speak of?—A. It would involve ordering it that way from the factory and in that case they would simply cut the stud in which the pulley was mounted on a little bit longer, leaving it extend out.

Q. Would that require any modification of the machine itself?—A. No, none.

The import of this testimony is that a longer shaft or pulley would have to be ordered from the factory but that the machine itself would not be modified when it was attached.

While the testimony did not establish either the cost of substituting another source of power or the time required to do it, the uncontradicted description of the work to be done is sufficient to indicate, *prima facie*, that the modifications required were not substantial. The situation here is quite different from that in the *Berkley Machine Company* case, *supra*, where the machine was very complex and there was convincing evidence by a well-qualified expert that the machine could not be converted without substantial modifications.

We conclude that the record establishes that the woodworking machines here involved may be operated without substantial modification by motive power other than electricity and are not essentially electrical articles.

Plaintiff claims that, therefore, the articles are not entireties, and the machines are classifiable as such under paragraph 372 and the motors as articles having as an essential feature an electrical element or device under paragraph 353.

This follows unless the motors are integral parts of the machines, in which case they would be classifiable as such. *Gallagher & Ascher Company* v. *United States*, 52 CCPA 11, C.A.D. 849 (auxiliary heaters for Volkswagen automobiles held to be integral parts of automobiles rather than classifiable as electrical articles under paragraph 353); *Acec Electric Corp.* v. *United States*, 55 Cust. Ct. 138, C.D. 2563 (clutch-brake electric motors designed and dedicated for use with industrial sewing machines held dutiable as parts of sewing machines rather than as electrical articles under paragraph 353).

Where, however, the evidence established that a gasoline engine was not an indispensable power producing element in the operation of

saws, the gasoline engine could be readily detached, and when so detached, could be used for various other purposes and in various other ways, it was held dutiable separately. *Geo. S. Bush & Co., Inc.* v. *United States*, 41 CCPA 33, C.A.D. 525.

In *Clarence S. Holmes* v. *United States*, 37 Cust. Ct. 260, C.D. 1833, the court held that blower and feeder assemblies with their accompanying motors were not classifiable as entireties. In that case, the record was without evidence of what use, if any, the electric motors would have after detachment, but the court found that they were not essential to the normal functioning of the blowers and feeders and that the latter were not essentially electrical articles, but that the electric motors were. It concluded that there were two separate tariff entities, blowers and feeders on one hand, and electric motors on the other, and held that since they had been appraised as an entirety, the appraisements were void and the liquidations founded thereon were also void. The case was, therefore, remanded to a single judge to find separate values.

However, in recent cases, it has been held that the burden rests on plaintiff to establish not only that the machines *per se* are not essentially electrical articles but that the electric motors are standard or multipurpose motors and are not designed for use exclusively with the imported machines. *Border Brokerage Company, Inc., et al.* v. *United States*, 58 Cust. Ct. 185, C.D. 2929; *Elser Elevator Company* v. *United States*, 58 Cust. Ct. 432, C.D. 3009; *Inter-Maritime Fwdg. Co., Inc.* v. *United States*, 58 Cust. Ct. 507, C.D. 3030.

In the *Border Brokerage* case there was testimony that the engine could be used for other applications, but the court held the evidence was not sufficient to indicate to what extent alterations to the engines would be necessary to adapt them to such other applications. Accordingly, the claim for constructive segregation was overruled.

In the *Elser* case, the record showed that the motors could be easily removed but did not establish whether they were capable of uses other than in driving and braking the involved escalators. The court held that such proof was prerequisite to a finding that the escalators and motors were separate tariff entities.

In the instant case, it was shown that the motors were readily detachable and that the machines could have been purchased without them. However, there is nothing in the record to indicate whether the motors were multipurpose or whether they were designed exclusively for use on the woodworking machines. On this record, the court cannot determine whether the motors were, or were not, dedicated to use with these machines, and whether they were, or were not, parts of the machines in the tariff sense. Therefore, we are constrained to overrule the protests without affirming the collector's classification. Judgment will be entered accordingly.