(C.D. 3009)

ELSER ELEVATOR COMPANY *v.* UNITED STATES

United States Customs Court, Second Division

(Decided May 22, 1967)

*Stein & Shostak* (*S. Richard Shostak* of counsel) for the plaintiff.
*Carl Eardley*, Acting Assistant Attorney General (*Richard J. Kaplan, Arthur H. Steinberg*, and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before RAO, FORD, and RICHARDSON, Judges

RICHARDSON, Judge: The merchandise of this protest consists of escalators imported in knocked-down condition at San Diego, Calif., from West Germany, and classified in liquidation under the provision of 19 U.S.C.A., section 1001, paragraph 353 (paragraph 353, Tariff Act of 1930) as modified by T.D. 52739, as articles having as an essential feature an electrical element or device, at 13¾ per centum ad valorem. It is claimed by the plaintiff-importer that all parts other than motors should be classified under the provision for machines and parts of 19 U.S.C.A., section 1001, paragraph 372 (paragraph 372, Tariff Act of 1930) as modified by T.D. 54108 at 11½ per centum ad valorem; that the motors are dutiable under the electrical articles and parts provision of paragraph 353 as modified by T.D. 54108 at the rate of 10½ per centum ad valorem; and that the appraisement is void because the escalators were appraised as entireties and not as separate items consisting of structural parts and motors.

It is conceded by the parties that the involved escalators, totaling 8 in number, are in fact machines and parts of machines, and that they are composed of materials which are in chief value of metal. Plaintiff's principal contention is that the escalators are not essentially electrical articles because motive power other than electricity may be used to operate or drive them. Defendant maintains that plaintiff has failed to prove that the escalators may be operated safely and normally by a means of power other than electricity.

The competing tariff provisions read as follows:

[Par. 353, as modified by T.D. 52739]   Articles having as an essential feature an electrical element or device * * * wholly or in chief value of metal, and not specially provided for:

 *        *        *        *        *        *        *

Other (except * * * ) _____ 13¾% ad val.

[Par. 353, as modified by T.D. 54108] Articles having as an essential feature an electrical element or device, such as electric motors * * *:

\*      \*      \*      \*      \*      \*      \*

Motors:
    Of more than $\frac{1}{10}$ horsepower but less
    than 200 horsepower_____ 10½% ad val.

[Par. 372, as modified by T.D. 54108] Machines, finished or unfinished, not specially provided for:

\*      \*      \*      \*      \*      \*      \*

Other (except * * * ) _____ 11½% ad val.

Parts, not specially provided for, wholly or in chief
value of metal or porcelain, of any article pro-
vided for in any item 372 in this Part_____ The rate for the
                                                 article of
                                               which they
                                               are parts.

Thomas F. Jarvis, chief engineer of the plaintiff company testified, among other things, that he installed the involved escalators, that the structural portions consisted of trusses, guides, tubing, runways for the steps, drive mechanisms, welded members (including the well at the bottom), support for the deck and steps, engine room, the steps, the balustrades, handrails, and other devices. Mr. Jarvis stated that the only items which are electrical in nature are the motors, wiring, brake, and some auxiliary switches, and he estimated these items to have a value of approximately 3.6 percent of the total value of the escalators. With respect to one of the involved installations, namely, an installation at the J. J. Newberry store in the College Grove Shopping Center in San Diego, the witness testified that he arranged for and supervised the installation of an 8 horsepower gasoline engine to drive the escalator for demonstration purposes, and that during the demonstration operation with the gasoline engine drive as many as 16 people rode on the escalator.

Photographs placed in evidence as exhibits 3, 4, and 5, show the gasoline engine, respectively, in place in the engine room, coupled to the geardrive of the escalator, and, presumably, in operation with passengers standing on the escalator steps. Another photograph, received in evidence as exhibit 2, shows the electric drive motor imported with the escalator in place in the engine room and coupled to the drive mechanism of the escalator, with the small brake motor resting in position on the housing of the drive motor. It appears, however, that the demonstration operation served only as an attempt (for the benefit of customs officials) to illustrate the capability of an internal combus-

tion engine to drive the escalator. It was brought out in the testimony that the brake motor was not used in the demonstration operation, nor were the electrical supervisory systems employed in such operation. But Mr. Jarvis stated that had he been asked to do so, he could have tied these electrical supervisory systems and the escalator brake in to function with the gasoline engine, and further, that with a 14 or 15 horsepower gasoline engine driving the escalator adequate braking could be obtained by means of engine compression alone.

The witness explained that a number of other functions either handled by an electric motor installation or eliminated in its use, could be provided for in a gasoline engine installation, namely, the venting of exhaust gases and fumes to the outside, the supplying of fuel from the outside, reversing direction of the escalator motion, and the sound-proofing or muffling of engine noise, giving details as to how these problematical situations could be handled or eliminated. He was of the opinion that the application of any particular power in the driving of an escalator is only a matter of connection of the power source with the escalator structure, and does not require any changes in the structure of the escalator or its drive shaft, and that the modifications of the power source could be made with little expense in time or money.

Mr. Jarvis also testified that he had not seen an escalator installation which was not electrically driven or operated. To the same effect was the testimony given by George Giguette, a graduate electrical engineer and district sales manager in the elevator division of Westinghouse Electric Corporation, who stated that he had never seen a gasoline engine driven escalator, nor had he ever dealt with or seen an escalator being operated by any power other than electricity. Mr. Giguette did admit, however, that it might be possible that by the use of auxiliary devices (described by Mr. Jarvis) a gasoline engine could perform the same functions as an electrically driven escalator and in the same manner.

Apart from the matter of motive power, testimony and other evidence was presented with respect to alternate power sources for operating the supervisory systems of the involved escalators. Franklin Banks, a graduate industrial engineer and sales engineer and engineering consultant in the employ of Sterer Engineering Company with experience in mechanical and hydraulic systems for aircraft and space vehicles, testified that he had studied and inspected at the behest of the plaintiff the structure and control systems of the subject escalators, and had inspected one installation (Newberry store job) and talked with the plaintiff's people about its operations. Mr. Banks testified that he was most interested in the electrical supervisory system, and he designed a non-electric alternate system to replace it, that in the course of

familiarizing himself with the electrical supervisory system he found that its primary function was to stop and brake the escalator whenever one of numerous switches, such as cover plate and skirt guard contacts, at various locations was tripped, that in the electrical operation of the escalator, whenever something mechanical tripped one of the safety switches, the safety switch turned off the electric motor by electric signals and applied the mechanical brake with electric power. The witness stated that he determined that there are several types of systems (including hydraulic, pneumatic and vacuumatic systems) that could do the job, and prepared a schematic drawing (exhibit 6) and cost estimate on a supervisory vacuum system incorporating substitutes for all the contact points provided for on the Newberry escalator which he viewed. According to Mr. Banks, the cost of installing such a supervisory vacuum system would be approximately $1,000, would entail no modification of the structure of the escalator, and would accomplish the same objects which the electric system accomplished and in the same manner (turn off the prime motive power and brake the escalator to a stop), eliminating in the process the use of the small brake motor, safety switches and attendant wiring, and the control box.

On the basis of the evidence of record, the court is of the opinion that the involved escalators are not articles having as an essential feature an electrical element or device, within the meaning of paragraph 353. The undisputed evidence clearly establishes, in our judgment, that the involved escalators are capable of being driven and operated by motive power other than electricity. And the adaptability of the subject escalators to the employment of alternate power sources in their operation removes the article from the category of being an essentially electrical article. *United States* v. *Baker Perkins, Inc., R. F. Downing Co., Inc.*, 46 CCPA 128, C.A.D. 714; *United States* v. *Dryden Rubber Co.*, 22 CCPA 51, T.D. 47050.

We do not agree with defendant's contention that plaintiff has failed to prove that the involved escalators may not be operated normally or safely by motive power other than electricity. Witnesses, whose qualifications we regard as being adequate, have testified to the contrary without contraindication in the record. Moreover, the supervisory systems, whether electrically operated or otherwise, fall into the category of being "safety devices" the principal objects of which are to detect and to correct or prevent malfunctioning of the escalator and to minimize harm to passengers. Such a limited role of the supervisory systems does not qualify the escalators for classification as essentially electrical articles since the supervisory systems play no role in the actual operation of the escalators for the purpose for which they are

constructed. *Brown Boveri Corp. et al.* v. *United States*, 58 Cust. Ct. 131, C.D. 2905, protest 61/9660 (New York), decided February 27, 1967; *R. J. Saunders Co., Inc.* v. *United States*, 47 Cust. Ct. 319, Abstract 66095.

In plaintiff's protest and the amendment which it agreed be stricken at the trial (R. 4) it sought to have the various constituent parts of the escalators classified separately from the motors. In plaintiff's brief it attempts to assert a claim of entireties. We are of the opinion that the claim must fail for lack of proof in the record sufficient to rebut the presumption of correctness attaching to the involved appraisements.

Notwithstanding our present finding that the involved escalators are not essentially electrical articles, it does not necessarily follow that in their imported condition appraisement of the subject escalators as entireties was not justified or proper, that is to say, each escalator together with its accompanying motors constituting a single tariff entity. Plaintiff has adduced no proof tending to show that the electric motors are not integral parts of the escalator with which they are associated and imported, and that they were not designed for use with and intended to be used with these escalators exclusively.

Granted that the instant record does show that the subject motors are easily removed from the escalators of which they are part (for purposes of replacement with another source of power as in the case of the demonstrated use herein of the gasoline engine), it has not been shown to what other purpose or purposes these motors are capable of being put if not in driving and braking the involved escalators. It has not been established that these motors are what might be regarded as being standard or multiple-purpose electric motors. Such proof, we think, is prerequisite to a finding that the involved escalators and their motors constitute separate tariff entities. See and compare, *Supreme Woodwording Machine et al.* v. *United States*, 54 Cust. Ct. 368, Abstract 69204. Since plaintiff has made no protest claim for classification of the involved escalators *and their motors* under the provision for machines in paragraph 372, the protest must be overruled, without, however, affirming the classification of the collector.

Judgment will be entered accordingly.