(C.D. 3393)

JOHN H. FAUNCE PHILA., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided April 8, 1968)

*Allerton dcO. Tompkins* for the plaintiff.

*Edwin L. Weisl, Jr.*, Assistant Attorney General (*Charles P. Deem* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before RAO, FORD, and BECKWORTH, Judges; BECKWORTH, J., dissenting

RAO, Chief Judge: The protests listed in the schedule, attached to this decision and made a part hereof, were consolidated for purposes of trial. They place in issue the essentiality of electric motors to certain pieces of equipment used in a chemical plant. These machines and parts thereof were classified as articles having as an essential feature an electrical element or device, not specially provided for, under paragraph 353 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, and assessed with duty at the rate of 13¾ per centum ad valorem. Plaintiff claims that the importations are classifiable as machines and parts, not specially provided for, under paragraph 372 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, and dutiable at the rate of 11½ per centum ad valorem. Plaintiff further claims that the electric motors are separately classifiable as motors under said paragraph 353, as modified by the sixth protocol, *supra*, and dutiable as provided therein according to their horsepower.

The protests have been abandoned as to the following items:

Protest 63/20287 – articles classified with duty at 19 per centum ad valorem.

Protest 63/15585, entry 29775 – sulphuric acid heaters, BP-87, BP-88, and BP-89, central lubricating systems, BP-91.

Protest 63/15585, entry 4456 – silicone cable 3 x 1, 5 MM2.

Accordingly, we dismiss those protests insofar as they relate to the abandoned claims.

The statutory provisions relevant to the remaining issues are as follows:

Paragraph 353, as modified by T.D. 52739:

Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:

    *       *       *       *       *       *       *

    Other (except * * *) _____ 13¾% ad val.

Paragraph 372, as modified by T.D. 54108:

Machines, finished or unfinished, not specially provided for:

  \*       \*       \*       \*       \*       \*       \*

      Other (except \* \* \*) _____ 11½% ad val.

Paragraph 353, as modified by T.D. 54108:

Articles having as a essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:

  \*       \*       \*       \*       \*       \*       \*

    Motors:
        Of more than $\frac{1}{10}$ horsepower but less than 200 horsepower _____ 10½% ad val.
        Other _____ 12½% ad val.

Mr. Douglas Beers, a chemical engineer in the employ of Vulcan Cincinnati, Inc., the importer herein, testified on behalf of plaintiff. Mr. Beers stated that he holds a bachelor of science degree in chemical engineering and has worked extensively in the erection of chemical plants for 20 years.

Mr. Beers testified that, in the course of his management duties, he indirectly supervised the purchase of the equipment involved herein which was obtained for the purpose of upgrading an acid plant in Paulsboro, N. J., and he became familiar with the articles from study of the blueprints and observation of the installation and first operation. The witness stated that all the items involved employed energy and force and transmitted motion. In actual use, they were powered by electric motors.

It has not been seriously disputed that these articles are machines and we have no difficulty in concluding, in light of the witness' testimony, detailed, *infra*, that all the items imported fall within the common meaning of the term "machines" or "parts thereof," *United States* v. *IDL Mfg. & Sales Corp.*, 48 CCPA 17, C.A.D. 756; *Nord Light, Inc.* v. *United States*, 49 CCPA 12, C.A.D. 786. Hence, the central issue is confined to the question of whether electric elements or devices are essential to the functioning of the imported articles.

The general thrust of Mr. Beers' testimony was that electric motors were only one of a number of alternative methods of providing power for these machines and that the importations were suitable for use with nonelectric power sources. The machines involved herein, possessing some degree of complexity, were described in a detailed and competent manner by Mr. Beers. For the purpose of this discussion, however, we will dwell more upon the role of the electric motors in the working of

the machines and less upon the machines' functions in the manufacturing process.

Regarding the importations known as dust collectors, the witness testified that a ¾-horsepower electric motor was mounted on each unit with four bolts. This motor transmitted power to a single shaft which activated a mechanism for shaking certain fabric tubes and freeing them of powder and dust. According to the witness, removing the electric motor would be the work of 15 minutes. The substitution of a shaft with a pinion gear on one end and a pulley on the other in the place of the motor would allow the use of any power source transmitting its force by belt or chain. The witness stated that, in many cases, such equipment was attached to a common power shaft driven by steam engine, gasoline engine, or water wheel. The witness indicated also that the items invoiced as "spare parts for Standard Round Filter" were metal replacement parts for said dust collectors.

On articles known as fluorspar screw conveyers, imported without electric motors, holes were provided for the mounting of an electric motor to drive the shaft and the screw mounted thereon, causing the screw to rotate in a covered trough and transport particles of powder. According to the witness, a belt pulley could transmit power to the shaft from a steam, gasoline, or diesel engine as an alternative to an electric motor. The witness testified in a similar manner with regard to the fluorspar sealing screws and the gypsum exit conveyers also involved herein.

According to the record, two other types of equipment in issue, kiln inlet heads and kiln seal fluid supply units, are used in connection with rotary kilns for the purpose of sealing the kilns and pumping liquid tar to perfect the seal. The witness testified that the kiln inlet heads were capable of being used with any rotary kiln of the same size regardless of the kiln's source of power and were not dedicated to use with kilns rotated by electric power. Consequently, this court would not consider them to be parts under the test of *United States* v. *Ford Motor Company*, 51 CCPA 22, C.A.D. 831, under which articles, which are not dedicated to any one of a number of equally feasible alternative commercial uses, are not parts, and a discussion of the essentiality of an electric motor to the kiln with which they are used becomes irrelevant to their classification.

Such a discussion, however, is necessary with regard to the kiln seal fluid supply units since nothing appears in the record to overcome the presumption that they are dedicated to use with kilns which are rotated by electric motors. Hence, with regard to these units, it becomes pertinent to decide whether the kilns with which they are used have as an essential feature an electric element or device. On this subject, the witness testified that the rotary kilns were driven by electric motors

mounted on the ground and connected by belt or chain to a drive shaft running through the core of the kiln. According to the witness, the kiln could have been driven by any other convenient source of power. In addition, the witness stated that the exact means of heating the kiln was not an essential part of its design and, although electrical controls were used in connection with its heating by oil or gas, no change in the kiln would be required to allow heating by methods which would not require electrical controls, such as steam or coal.

As regards the kiln seal fluid supply units themselves, the witness stated that they were imported with a pump and an electric heater but without a driving mechanism. A shaft extending from the pump was capable of receiving whatever type of drive was provided. The witness testified that it would take a few minutes to remove the electric heater from its flanges. Some other type of heating device could then be used in its place.

Another of the disputed importations consists of so-called Libra dosing scales in which drums, from the center of which drive shafts extend, are rotated and emptied when the powder filling them reaches a certain weight. As imported, the articles contained an electric switch box in anticipation of the electric motor which eventually was used to drive them. However, according to the witness, the units were, by design, suitable for other drives which could have been used alternatively, in which case the switch boxes would have been vestigial. On cross-examination, the witness answered as follows:

Q. Protest 63/15585, entry 27915, Mr. Beers, would you please tell the court what provision was made on the Libra dosing scale for drive, and we will look at Exhibit 2 and see if we can see anything there?— A. The drive is located at the center of the drum. The shaft extends from this point, and it was at this location that the gear motor was actually mounted in the actual installation of the unit, and it is at this point that a pulley, or some other suitable drive would have been added.

Q. How was the electric motor mounted?—A. There was no electric motor mounted on it when the equipment was received.

Q. But subsequently?—A. It was bolted onto the equipment.

Q. Was there a provision made for the bolting of an electric motor on the design?—A. I presume that the holes were already drilled, and a mounting had to be designed to fit that for the gear motor which was purchased in this country. As in the case of the conveyors, equipment which is designed for wide use in many different plants, with different power sources; this had to be suitable for such electric drives, as well as belt drives, or chain drives.

Regarding the rotary horizontal ball mills imported without electrical features, which consist principally of a drum in which particles are ground to powder, the witness testified that a shaft extended from the unit to which any power source might be added without modification

of the article. The same was true of the Ko-Kneaders, certain blenders utilizing an interrupted screw in a closed trough. Imported without an electric motor, but possessing holes in their base plates suitable for mounting one and utilizing an electric motor in actual use, these units had long shafts extending from their gear boxes designed to be suitable for use with any drive chosen by the user. As with the Libra dosing scale, a switch box was attached to the article. The Ko-Kneaders were lubricated by an external lubricating unit possessing a considerable amount of electrical instrumentation. According to the witness however, lubrication could be accomplished by any lubricating unit and would require no change in the Ko-Kneaders. The testimony regarding this unit was as follows:

Q. Explain to the court how this lubricating system works, and how it is tied in with the Ko-Kneader, and what function it performs.—A. There are several points in the Ko-Kneader which require forced lubrication, and——

Q. Let me interrupt. Why is that? Is there something peculiar about this particular device?—A. You might say it is peculiar to any device in which large amounts of energy are expended in a rather confined space. As in the case of an automobile engine, where forced lubrication is used on various bearings, an oil pump is provided, which in the case of the automobile engine, is usually driven by the engine. In this case the lubrication unit was a separate unit, separate pumping unit, and it did have as part of it, some considerable amount of electrical instrumentation, but the Ko-Kneader could have been lubricated as well by some other type of lubricating unit, such as might be driven by sources of power other than electricity.

Q. That again is an assumption on your part.—A. That is specific knowledge on my part, that an electrically driven and controlled lubricated unit is not an essential part of the Ko-Kneader. It is only necessary that the Ko-Kneader have some lubricating pump provided for it, and that pump can be driven and controlled by mechanical means as well as electrical.

Q. In any event, the Ko-Kneader is lubricated and was designed to be lubricated by a lubricating system that was imported here along with it, and set up and used with it, is that not correct?—A. It was designed for a certain purpose, and part of the auxiliary which it required was a lubricating device. The particular one that was used was electrical, but a lubricating device powered by some means other than electrical would have served just as well, and required no change in the Ko-Kneader being used.

Finally, the witness discussed the scrubbing liquid acid tanks imported without electric motors and used as parts of mechanical mixers and agitators. Part of the tank is driven in rotary motion from the outside while internal parts of the tank are also rotated to cause agitation. According to the witness and in keeping with the substitutions noted previously, the driving could be accomplished by any power source.

With regard to the issue of the essentiality of electric features to imported articles, it is settled that an electric motor is not essential if it or other power can be used interchangeably and if the substitution of the other power source can be accomplished without substantial modification of the imported article. *United States* v. *Dryden Rubber Co.*, 22 CCPA 51, T.D. 47050; *Ralph C. Coxhead Corp.* v. *United States*, 22 CCPA 96, T.D. 47080; *United States* v. *Baker Perkins, Inc., et al.*, 46 CCPA 128, C.A.D. 714.

Defendant first attacks the testimony offered by plaintiff's witness on the ground that Mr. Beers was not a mechanical engineer and lacked the necessary familiarity with the instant articles. We see no merit in this approach and find no reason to doubt the witness' expertise. His role as a chemical engineer, concerned with the production of chemical substances through the use of the instant importations, his many years of work for a company involved in the erection of chemical plants, and his participation in the installation of the instant equipment qualify him to speak authoritatively on these matters. We do not see a reason to limit chemical engineers to matters of chemistry any more than we would limit farmers to testimony about crops or doctors to testimony about disease and exclude their testimony about the equipment they use. In short, with regard to equipment, the status of an expert can be attained both by a direct involvement in the manufacture thereof or by an extensive familiarity with it in the related phase of its use in the manufacturing process. See for example *Union Sugar Div. Consolidated Foods Corp.* v. *United States*, 55 Cust. Ct. 113, C.D. 2559, in which this court relied heavily on the testimony of a chemical engineer for insight into the functioning of complicated machinery used in the manufacture of sugar, although concededly no issue was raised as to the witness' qualifications. See generally section 388, Richardson on Evidence, ninth edition.

Defendant attacks the substance of the testimony given by plaintiff's witness claiming that it is weak in certain particulars, namely, full details of time and cost involved in the substitution of nonelectric power sources. We consider such details unnecessary where, as here, the testimony of an expert witness describing the work involved in the substitution clearly indicated that the labor and modifications required are minimal.

To begin with, we distinguish between the mechanical working of the machines involved herein, which is indeed of a complicated nature, and the method by which they are connected to the power source and receive their motive power. The testimony shows that all the contested machines possess drive shafts extending from their bodies to which shafts the electric motors were attached in actual use. This method of supplying power is a basic and uncomplicated technique in which

the motor has the minimal involvement spatially and mechanically with the internal workings of the machine. The fact that electric motors were imported attached to the dust collectors and were later attached to prepared bolt holes on the other machines adds no complications to the substitution process. The removal of the motors was simply the work of detaching the bolts. This is exactly the same process used for removal of electric motors in *Henry A Wess, Inc.* v. *United States*, 43 Cust. Ct. 78, C.D. 2107; *Keer, Maurer Company* v. *United States*, 48 Cust. Ct. 205, C.D. 2336; *F. B. Vandegrift & Co., Inc.* v. *United States*, 56 Cust. Ct. 46, C.D. 2610; *Arnhold Ceramics, Inc.* v. *United States*, 56 Cust. Ct. 416, C.D. 2668; *Gene Miller* and *Atwood Imports, Inc.* v. *United States*, 59 Cust. Ct. 212, C.D. 3125. In fact, a number of these cases involved the removal of more than one motor from each machine and in addition involved power transmitting connections between the motor and machine of a more complicated nature than the rudimentary connections herein. See for example *Keer, Maurer Company* v. *United States, supra*, in which substitution of power required the removal of two electric motors, the main one attached by flexible V rubber belts and the second one attached by four vacuum pipelines.

The substitution of nonelectric power sources and their connection by belt, chain, and pulley systems is precisely that means of connection which epitomized ease of substitution in many prior cases. *United States* v. *Baker Perkins, Inc., et al., supra*.

The portion of the cross-examination of plaintiff's witness herein, quoted below, illustrates the consistency of the testimony with criteria developed in the case law:

Q. With reference to items 109, 112 and 119 on the same entry the screw conveyors, you testified that they are not designed to be driven by electricity. Would you mind telling the court upon what you base that statement? Could you tell how they are driven now, or how they would be driven with various types of power?—A. The three conveyors to which you are referring are driven by gear head motors. However, they could just as well have been driven through a belt, as were in fact some of the conveyors that we have been discussing, and the power could be transmitted through this belt from any source.

Q. When you say just as well, what would you have to do? Let me ask one question before I ask that. Where are the motors located? Where was provision made, if any was made, on these conveyors, or on their bases, for the attachment of the electric motor, or any other source of power?—A. There were attached to these conveyors, as is customary in equipment which has a wide application using a number of power sources, there were provisions for the mounting of motors, and in fact motors were mounted there. However, these motor mounts do not interfere with the use, instead of some other source of power, which feature is also a part of the design.

Q. In what way?—A. They permit the addition of pulleys onto the shaft, which can receive the power from any source. In fact, in some of the other conveyors, the power was supplied through such pulleys, or I should say through such belts to such pulleys rather than having a direct attachment of a gear motor.

Q. The pulley takes the place of one of the bevel gears in such an instance as that?—A. Well, indirectly I suppose you might say so, except the pulley can be fastened directly onto the shaft, whereas the bevel gear is fastened to a second shaft, which then has to be fastened with a coupling to the screw.

Q. In other words, you must have to separate the coupling and second shaft in order to use something other than electricity?—A. You wouldn't have to do anything like that, because there were no couplings and no second shafts supplied with these units.

Q. But the device was designed to have that?—A. It was designed to be driven, and there were provisions there for it to be driven by whatever means is convenient. For instance, there were mounting holes for a motor, if that were used, or alternatively, the shaft was suitable for application of a belt pulley.

Q. Not to belabor this point too much, but how is the shaft suitable for a pulley? What makes it suitable?—A. It has sufficient extension beyond the bearing for a pulley to be fastened.

JUDGE RICHARDSON: Does the belt pulley have to have some sort of motor power to move it? Can the belt cause motion itself without a motor power to stimulate it?

THE WITNESS: Yes, sir, there has to be some power provided for the belt, and this can be provided by steam, or gasoline engine, or diesel engine. The steam turbine or steam engine is frequently economical in a large chemical plant, where steam is used for many other purposes, and in such a case it permits the provision of power shafts conveniently located, from which belts can be carried to the individual items of equipment to be driven.

We hold to the view that testimony concerning the technique of substitution is perfectly acceptable when phrased as an opinion based on knowledge of the machinery involved and need not be based on involvement in, or observation of, such a substitution. In fact proof of actual operation of disputed machinery by power other than electrical is not necessary. As the Court of Customs and Patent Appeals stated in *United States* v. *Baker Perkins, supra:*

* * * In this day and age the water wheel and steam engine have passed from the commercial scene insofar as the operation of factory machine tools is concerned. One need not look far to discover that almost every machine in a factory is operated by an electric motor as a practical commercial matter. If this fact is to be taken into consideration in construing paragraph 353 then the humblest wood-turning lathe and every other device having a pulley or sprocket on it for the attachment of a drive belt or a chain is going to become an "article having as an essential feature an electrical element or device" because,

practically, it is going to be operated by electrical motive power if it is operated at all.

In short, we find the testimony of the expert witness persuasive, the mode of substitution consistent with that utilized in numerous prior cases, and the need for detailed proofs of cost and time obviated by the clear description of the work to be done. As this court said in the recent case of *Gene Miller* and *Atwood Imports, Inc.* v. *United States*, *supra*:

While the testimony did not establish either the cost of substituting another source of power or the time required to do it, the uncontradicted description of the work to be done is sufficient to indicate, *prima facie*, that the modifications required were not substantial. The situation here is quite different from that in the *Berkley Machine Company* case, *supra*, where the machine was very complex and there was convincing evidence by a well-qualified expert that the machine could not be converted without substantial modifications.

Testimony regarding the time and expense involved in the replacement of electric power is of critical importance only when the extent of change required in the substitution of other power is not apparent from a description of the work to be done or where a conflict exists between expert witnesses. See for example *Berkley Machine Company* v. *United States*, 55 Cust. Ct. 444, Abstract 69577.

Here the testimony shows that substitution of power source is, in the case of all the contested machines, simply a matter of the connection of belts or chains to drive shafts and involves no substantial modifications. Consequently we conclude that the importations, with the exception of the dust collectors, are machines and parts not specially provided for and not articles having as an essential feature an electrical element or device.

We except the dust collectors solely for the reason that no proof has been offered as to whether the motors with which they are imported are standard or special purpose motors. In recent cases, it has been pointed out that in the absence of such proof this court can make no determination regarding said motors. *Inter Maritime Fwdg. Co., Inc.* v. *United States*, 58 Cust. Ct. 507, C.D. 3030. One possibility is that a motor, despite a showing of nonessentiality from a paragraph 353 standpoint, may still be a part of a machine in the dedication sense of *Gallagher & Ascher Company* v. *United States*, 52 CCPA 11, C.A.D. 849. Thus, if a showing is made that the motor is a special purpose one dedicated to use with the machine in question, we would hold the motor to be a part of the machine under paragraph 372. The other possibility is that if the motor is shown to be general purpose it will be classifiable under the *eo nomine* provisions for such motors. Absent proof regarding the motors, we accordingly must overrule protests 63/20287 and 63/15578 without affirming the classification of

the collector as they relate to the dust collectors and spare parts for the standard round filter. We sustain the protests, however, as they relate to the screw conveyers, kiln inlet heads, Libra dosing scales, parts for horizontal ball mills, Ko-Kneaders, scrubbing liquid acid tanks, fluorspar sealing screws, kiln seal supply units, and gypsum exit conveyers, all of which are classifiable as machines or parts of machines, not specially provided for, under paragraph 372 of the Tariff Act of 1930, as modified by the sixth protocol, *supra*, and dutiable at the rate of 11½ per centum ad valorem.

Judgment will be entered accordingly.

### DISSENTING OPINION

BECKWORTH, Judge: On the basis of the record presented, I regretfully dissent from the view of my colleagues that the evidence has established that the machines involved herein are not essentially electrical.

All of the items were classified by the collector as articles having as an essential feature an electrical element or device, or parts thereof, and were assessed with duty under paragraph 353 of the Tariff Act of 1930, as modified. It is presumed that the collector found all of the facts necessary to sustain that classification. *E. I. du Pont de Nemours & Co.* v. *United States*, 27 CCPA 146, 149, C.A.D. 75.

It is well settled that if an imported article is so constructed as to be operable solely by means of electrical power, it has as an essential feature an electrical element or device. *United States* v. *Dryden Rubber Co.*, 22 CCPA 51, T.D. 47050; *United States* v. *Baker Perkins, Inc., et al.*, 46 CCPA 128, C.A.D. 714. It has also been held that an electric motor is not an essential element if the machine is so designed and constructed that it may, without substantial modification, be interchangeably operated by other power. *Ralph C. Coxhead Corp.* v. *United States*, 22 CCPA 96, T.D. 47080. Presumably, the collector found that the items here involved were so constructed as to be operable only with electric power or that other power could not be substituted without substantial modification of the machines. The issue presented is whether the testimony is sufficient to overcome that presumption.

While it has been held that where an electric motor could be removed by taking out bolts and another source of power substituted by the use of pulleys and belts, the electric element or device was not an essential feature (*Gene Miller* and *Atwood Imports, Inc.* v. *United States*, 59 Cust. Ct. 212, C.D. 3125, and cases cited), in those cases there was some evidence of the time it would take to make the modification (at the most 6 hours) and the cost (up to $100). The witness, in each case, was experienced in the construction, use, and operation of the

machine involved or personally knew its function and features. The electric motors were standard general purpose motors. In *Clarence S. Holmes* v. *United States*, 37 Cust. Ct. 260, C.D. 1833, and *W. C. Sullivan & Company* v. *United States*, 46 Cust. Ct. 31, C.D. 2229, there was positive evidence that machines of the same kind had in fact been operated by nonelectric power.

In *Frank P. Dow Co., Inc., et al.* v. *United States*, 52 Cust. Ct. 235, Abstract 68234, the court held that the evidence established that the prime source of power for the imported gangsaw might be an electric motor, diesel engine, or steam engine, and that merely connecting V-belts to any of those sources of power would enable power to be delivered to the machine without any modification thereof. However, the machine also had an electric motor-driven automatic pressure lubricator and an automatic overhang electric motor control. There was evidence that a *diesel* driven gangsaw had a ratchet for lubrication incorporated within it. The court held, however, that there was no evidence that a machine designed and imported with an electric motor for automatic lubrication could be converted to use a ratchet without substantial modification or reconstruction of the functional properties of the machine. It also held that the evidence did not establish what modification would be necessary to make a substitution for the electrically operated automatic overhand control. It was, therefore, held that the gangsaws were essentially electrical articles.

In *Berkley Machine Company* v. *United States*, 55 Cust. Ct. 444, Abstract 69577, the court pointed out (p. 451):

* * * The extent of such a conversion sometimes, as in the instant case, must be determined from a hypothetical situation from the testimony of expert witnesses, since an actual conversion has never taken place according to the testimony herein. Estimated figures as given by said witnesses are understandably approximations. Conversion to a gasoline-powered motor was the exemplar in the instant case. There is no set figure for guidance as to what would constitute substantial or minor modification. Involved in making such a determination are such elements as cost of materials, possible substitute parts, labor, time, and, *inter alia*, possibly that the imported machine, after such conversion, shall remain reasonably suitable to perform its normal intended function with reasonable efficiency.

The court held that the record lacked sufficient convincing, reliable, evidence to support the claim that electricity was not essential to the operation of the imported envelope-making machines. The evidence was conflicting as to whether the modifications necessary to use another source of power would be minor and could be carried out by a good mechanic at a cost of $200, or whether the planning alone would take 2 days and the cost of conversion would be $4,000 or $5,000. The court

noted that there were two well-qualified witnesses, but stated (pp. 452–453):

\* \* \* Mr. Sotti, a mechanical engineer, president and general manager of the company owning the machine at bar, stated that he was personally responsible for its operation and maintenance. In fact, he had studied at one time the feasibility of converting to gasoline or other power other than electric, but found that the cost of purchasing the equipment would not be warranted. In his opinion, the said machine could be converted to power other than electricity, but not without substantial modification of the machine itself.

\*  \*  \*  \*  \*  \*  \*

We are at this point, therefore, lacking conclusive evidence as to what modification of the machine *per se* is required or the minimum cost of conversion. Further to this, the extent of whatever would constitute necessary modifications is at variance among the witnesses. This situation can be appreciated readily enough when we recall that all three witnesses herein testified, in substance, that they had never accomplished such a conversion, and had never seen or known of such a conversion.

This court, seeking some firm base on which to arrive at its determination, finds in the conflicting and varying cost estimates, and in the probable extent of necessary machine modifications, a situation which is at least conjectural.

In *Gene Miller* and *Atwood Imports, Inc.* v. *United States, supra,* the witness was a mechanical engineer who was thoroughly familiar with the machines involved. He had gone to training programs as comprehensive as tearing down a machine and rebuilding it, and he had the sole responsibility in the United States of seeing that the equipment was kept operating. He described in some detail how other sources of power could be substituted for electricity. The basic design of some of the machines was for hand-foot treadle operation; some were still used in this country with other than electric power. All of them were designed for world trade, and, since many countries do not have electric power, they were built so that steam or gasoline engines could be used. The witness had seen some of the machines operated with other than electric power.

In the instant case, all of the imported articles or the articles in which they were used were actually powered by electric motors after installation at the plant at Paulsboro, N.J. There is no evidence that the witness had ever seen like or similar equipment operated elsewhere or by any other source of power. There is nothing in the record to show that the witness designed or had a hand in or supervised the designing of any of the imported articles, nor that he installed or operated them or supervised their installation or operation. He said that in the course of his management duties he *indirectly* supervised the purchase of the equipment involved herein and that he became familiar with the items

and their functions and operations from a study of drawings and by observing them in operation. According to the record, he observed them at the time they were installed and at their first operation. The record does not show in any detail the extent of his familiarity with the operation of all of these items, how often he saw them, and the circumstances surrounding his observation of them in operation.

The articles involved here are not only complex in themselves but are parts of equipment including various machines, all used for the production of hydrogen fluoride or other acids at a large plant in Paulsboro, N.J. The witness described the articles; drawings of some of them, but no photographs, were received in evidence. As representative of his testimony, some of his descriptions are outlined below:

He said that the dust collectors were multibag filters, used for separating powder from air. He said each was cylindrical in shape and when in operation had fabric tubes or bags hanging from six positions. Dust was removed by passage of air through the fabric tubes leaving the dust on one wall of the fabric, a process similar to the action in a vacuum cleaner. In order for the tubes to be kept free from blinding by the powder, it was necessary that they be rapped or shaken at intervals. This was done by a mechanical apparatus consisting of a rotary cam arrangement driven from a single shaft by a ¾-horsepower electric motor which was on the equipment when imported.

According to the witness, the dust collectors had a place for the mounting of a motor or whatever other drive might be substituted. As imported, the units were supplied with gear head motors attached to the top of the apparatus by four bolts. The witness said that the motors could be removed in 15 minutes by the removal of four bolts. To substitute other power he stated:

You *could* mount a pillow block with a shaft in the block, and the pinion gear on the one end in the case of the gear motor, and a sheave on the other end to receive the power from whatever power source.

\* \* \* \* \* \* \*

\* \* \* You *would* have to have mounted on the device a shaft to carry the pinion gear and the pulley to which the power would be transmitted, *probably* by a belt or chain, from the common power source for the plant. In this case, the common source, power source for the plant was electricity. Another plant *might* have a steam driven power shaft. [Emphasis supplied.]

There is no evidence to show that anyone ever used other power or that other power could be substituted without substantial modification of the dust collectors themselves. The witness did not state how long it would take to substitute other power, the extent of the work on the machine itself, or the cost. To merely remove a motor may be a simple operation, but to substitute another form of power might well require considerably more work. If it did not, that fact should have been shown.

The witness described the kiln seal fluid supply units as "tar pumping units, which was tar having use as a lubricant on the seals incorporated in the heads of the kilns." As imported, each unit had a pump and an electric heater but no driving mechanism. The equipment had an extended shaft from the pump to receive whatever rotary drive might be provided. The witness did not recall whether it had a place for the motor. He knew that the pump was driven by a chain and said that the motor might have been mounted separately on a separate foundation. No motor was mounted as the equipment was received.

According to the witness, the electric heaters were included in the importation as a matter of convenience but another type of heater could be used. To substitute a steam or gas heater it would have been necessary to unbolt and detach the electric heater at the flanges which, he said, would have been the work of a few minutes as the equipment was designed specifically for easy removal for cleaning. At the same flanges some other heating device might have been added such as a steam heat changer. In such case, the electric heater would have been of no further use. This suggests that it was designed specifically for the unit and implies that the unit as imported was essentially electrical. Furthermore, there was no testimony as to the cost of a new heater or the expense, time, and modification involved in making the substitution.

The Libra dosing scales were used for metering powder and, according to the witness, were more properly designated as "weigh feeders." Each of the scales had a drum which was hung on a balance beam and a hopper which dropped powder into the drum. The drum balanced the weight on the other side of the balance beam, thus activating a mechanical linkage which closed the hopper and tripped the drive for the drum. The drum rotated, dumping the weighed batch of powder, and continued rotating until it was back in position to receive the next batch.

As imported, the equipment had no motor but contained an electric switch box in anticipation of the eventual addition of a motor. In fact, an electrical gear motor was added. The witness explained that the drive was located at the center of the drum, that the shaft extended from that point, and that it was at that location that the gear motor was mounted. At the same point, a pulley or some other suitable drive could have been added. In that case, the switch box would not have been used.

He described the rotary horizontal ball mills as parts of two rotary horizontal ball mills which all "seem" essential for the operation of the mills. The witness said such mills were used for grinding particulate solids to a fine powder, by placing them in a drum with metal cylinders or balls, rotating the drum, causing the solids to be ground

against the walls of the drum and the balls and cylinders. The equipment could be used with metal tubes instead of balls, and was designed so that the powder, after being ground, was elutriated from the mill by a stream of air which was circulated through the mill.

The witness said that he did not know whether the importation contained all the parts of a rotary mill, explaining that the equipment was extremely heavy and was not subject to importation all in one assembly. When asked whether he knew anything about the individual parts, he said he would recognize certain portions of them. He said that the parts were made specifically for these mills and were more or less interchangeable in mills of the same size. He thought because of the nature of the equipment that the manufacturer would design his mills so that the parts would be interchangeable among mills of the same dimension made by him, but would not be usable on other mills.

There were no electrical features on these articles in their imported condition. The witness testified, however:

* * * They were suitable to any suitable driving power. They are approximately five feet in diameter in one case, and six feet in diameter in the other. Each was about ten feet long at the drums.

He did not explain how electric power or any other power could be utilized to operate this large machine. He merely stated that there was a mounting which made it suitable for electric power as well as any other power. He should have supported this conclusion with evidence as to how this could be accomplished in connection with each source of power he had in mind.

According to the witness, Ko-Kneaders were blenders used for blending plastic materials or liquids and powders. The blending was done by an interrupted screw which rotates with oscillations, and with an end to end reciprocation in a closed baffled trough. Materials were introduced at one end, were blended, and the mixture discharged from the other end. An elaborate gear box and a switch box were included with the equipment, the latter with the anticipation of the eventual addition of an electric motor. An electric motor was, in fact, added after importation.

If electric power had not been employed, the switch box would have been unused. Moreover, the base plate of the Ko-Kneader contained holes suitable for mounting a motor, but if another type of power had been employed, the holes would not have been used.

The Ko-Kneader was lubricated with an external lubricating unit which had some considerable amount of electrical instrumentation, but the witness said it could have been lubricated as well by some other type of lubricating unit, driven by power other than electricity. It was only necessary that the Ko-Kneader have some lubricating pump provided for it. A device powered by some means other than electrical

would have served just as well and, according to the witness, would have required no change in the Ko-Kneader.

In general, the testimony of the witness regarding the use of another source of power consists of conclusory statements to the effect that the machines were suitable for any drive; that pulleys could be added on to the shaft to receive power from another source, and that the articles could be operated just as efficiently with nonelectric power. There is nothing in the record to show how much work would be required to substitute nonelectric power, what it would cost, or the extent of modification of the articles themselves. Although the witness stated in several instances that the articles were designed for wide use in many different plants, there is nothing in the record to show that he had anything to do with the design of the articles or that he had any personal knowledge of their use or the source of power used in other plants.

The witness testified on cross-examination:

* * * The steam turbine or steam engine is frequently economical in a large chemical plant, where steam is used for many other purposes, and in such a case it permits the provision of power shafts conveniently located, from which belts can be carried to the individual items of equipment to be driven.

He did not, however, specify or describe any chemical plants which he had seen which employed steam power, nor did he state that to his knowledge such plants had any equipment of the kind involved herein. In fact, he was rather uncertain as to the imported articles themselves. He could not identify the spare parts for the standard round filter, nor the parts of the ball mills. He was under the impression that one of the kiln heads was an outlet head rather than an inlet head as invoiced. He did not recall whether the motor for the agitator was mounted, and he did not know whether the kiln seal supply unit had a place for a motor.

In view of the record presented, I am of opinion that it has not been established that these machines are not essentially electrical or that they may be operated by means of other sources of power without substantial modification. Where, as here, the machines were intended to be, and were, in fact, operated electrically, to establish that some other source of power could be readily substituted without substantial modification of the machines, the evidence should be competent, clear, specific, and convincing. In the instant case it is not. The testimony of the witness was actually very vague and quite limited in describing the extent of change required for substituting other power and consisted in large part of conclusions that it was simply a matter of connecting belts and chains to other drive shafts. With the complex of machinery involved in this case, much more should have been shown.

It is not plausible, without more detailed information, that all of the articles could have been hooked up with another source of power in much the same way and as simply as the witness stated.

I am, of course, cognizant of the statements in *United States* v. *Baker Perkins, Inc., et al., supra,* that the mere contemplation of the use of electric motive power was not sufficient to constitute a machine an article having as an essential feature an electrical element and that the fact that electric power was the only practical commercial motivating force today was not to be considered in construing paragraph 353. Nevertheless, the language of paragraph 353 contemplates the inclusion of articles which are essentially electrical and which could not be used with other power without substantial modification. Where, as here, the machines are not actually used except with electric power, some definite facts regarding the modifications necessary for use with other power ought to appear on the record. Such elements might include the materials, labor, cost, and time which might be involved in making the change, the extent of the change, and facts indicating that the machine could function with its normal efficiency with the substitute power. In my opinion, the record here does not establish these elements to a satisfactory degree. I would, therefore, sustain the collector's classification and overrule the protests.