**Wayne WITHROW and Tubular Structures Corp. of America**

**v.**

**UNITED STATES.**

**C.D. 3693; Protest 65/19549-79089.**

United States Customs Court,
Second Division.

Feb. 5, 1969.

Glad & Tuttle, Los Angeles, Cal. (Robert Glenn White, Los Angeles, Cal., of counsel), for plaintiffs.

William D. Ruckelshaus, Asst. Atty. Gen. (Glenn E. Harris and Alfred A. Taylor, Jr., New York City, trial attorneys), for defendant.

WATSON, Judge:

The merchandise in this case consists of a Weitz Tower Crane, Type G, 75 HV–2, which was imported disassembled, with three electric motors. The collector classified the crane and the electric motors as an entirety under the provisions of paragraph 353 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, at the rate of 13¾ per centum ad valorem as an article having as an essential feature an electrical element or device.

Plaintiffs claim that the crane and electric motors are not properly classifiable as an entirety; that the crane is properly dutiable under paragraph 372 of the tariff act, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108, at the rate of 11½ per centum ad valorem as a machine, not specially provided for; and that the electric motors are properly dutiable under the provisions of paragraph 353 of the act, as modified by T.D. 54108, *supra,* at the rate of 10½ per centum ad valorem as electric motors of more than 1/10 horsepower but less than 200 horsepower.

The pertinent statutes herein involved are as follows:

*Classified under:*

Paragraph 353 of the Tariff Act of 1930, as modified by T.D. 52739:

Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

    Other &ast; &ast; &ast; ..........................13¾% ad val.

*Claimed under:*

Paragraph 372 of the Tariff Act of 1930, as modified by T.D. 54108:

Machines, finished or unfinished, not specially provided for:

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

    Other &ast; &ast; &ast; ..........................11½% ad val.

Paragraph 353 of the Tariff Act of 1930, as modified by T.D. 54108:

Motors:

Of more than 1/10 horsepower but less than 200 horsepower ...............................10½% ad val.

———◆———

The record in the case consists of the testimony of one witness for the plaintiffs, and one exhibit received in evidence on behalf of the plaintiffs. The official papers were admitted in evidence without being marked. (R.10.) Plaintiffs' exhibit 1 is a representative illustration of the imported Weitz Tower

Crane, Type G, 75 HV–2, except that the crane at bar was imported as a stationary crane, without the traveling device at its base. (R.9.)

Mr. Gunther P. Piepers, president of the Mayco-Crane Corporation, importer of tower cranes and window washing machines, testified that his duties with this corporation and previously with Tubular Structures Corporation were mainly to promote sales, to buy, and to be the general manager of the crane division. (R.7.) The witness stated that he is a civil engineer, having studied for five and a half years at the Technical University in Munich where he obtained his master's and doctor's diplomas.

Mr. Piepers, who stated that he was familiar with the imported merchandise, testified that the crane in question, as imported, was completely disassembled, and that not all of the motors as imported, were attached to the machine; that the hoisting motor, and the slewing motor on the crane were already installed, while the trolley motor was in a separate box to avoid damage. (R.9.) The witness stated that the imported crane was installed, as a stationary crane; that, as imported, the crane had three motors. The horsepower ratings as given on the invoices differ from those on plaintiffs' exhibit 1 due to the differences in cycles between electric current in Europe and in the United States. The cranes were also imported with an electrical control panel. (R.11.)

Plaintiffs' witness further testified that the three motors are referred to as the hoist motor, the slewing motor, and the trolley motor. (R.12.) He stated that the trolley motor is connected by nuts and bolts to the framework or to the base of the main jib; that it is not welded on to the framework or base, and that the motor could be removed by loosening the bolts and taking it off; that the trolley motor transmits motive power by gear to a little winch; that it would be possible to remove that motor and use some other source of power, and that this would be done by putting a gasoline engine or a diesel engine on the crane and connecting it in the same way as the electrical motor is connected. This would not require any modification of the crane and the crane would function in the same way as when the electric motor was used. (R.13–14.) Mr. Piepers further stated that the same motor gear coupling would be used with a gas or diesel engine. (R.14–15.)

With respect to the hoist motor, Mr. Piepers stated that it is bolted with heavy bolts to the chassis of the telescopic tower section; that the hoist motor could be removed and other sources of motive power used (R.15); that the hoist motor could be removed by taking the bolts off; that a gasoline or a diesel engine could be used in place of the hoist motor, again making the connection in the same way as with the trolley motor.

Plaintiffs' witness further testified that the slewing motor is also bolted down to the chassis, but that it could be removed and other sources of motive power, such as a gasoline or a diesel engine used (R.16); that to make the change-over to other sources of motive power, it would be necessary to obtain a hoist or slewing engine with the same horsepower ratings, connecting it to the framework of the crane, and making the gear connection as is done with the electrical motors. (R.16–17.) Plaintiffs' witness further testified that after the three electrical motors are replaced, and other sources of motor power used, the imported crane would still function for the purpose for which it was intended; that the design concept of the crane would not be affected at all, and that it would still be possible to control the crane from the driver's cab from which the crane is controlled. (R.17.) Mr. Piepers further stated that there are different ways of connecting up the control cab if other sources of motive power are used such as gasoline or a diesel engine; that the simplest way would be by cable connection and by clutches, but that if the motors are very heavy, it could be done with hydraulic controls. (R.17–18.)

Plaintiffs' witness then testified that the electric motors themselves could be used for other purposes. (R.18.)

Mr. Piepers stated that he had never seen the crane converted to the use of other sources of motive power, but that his company had considered converting it on certain jobs when there was no electric power supply available; that for this reason, the electrical equipment and the structural equipment were always invoiced separately, so that the company could make a choice and import the crane without the motors where it had an application where it did not have electrical power and it was necessary "to put gasoline engines on these machines." (R. 18–19.) Plaintiffs' witness further testified that the crane can be purchased without motors. Electric motors are used to operate the crane because it is cheaper to operate with electric power and, further, more safety features can be provided on the crane. (R.19.)

On cross-examination, plaintiffs' witness testified with respect to the dimensions for the spacing of the holes which take the nuts and bolts holding the trolley motor, that the motor is about 15 to 18 inches long, the cast base is somewhat shorter and the bolts in one direction are approximately 12 inches apart, and in the other direction maybe 6 inches apart. (R.20.) The witness stated that gasoline or diesel engines of the horsepower necessary to replace the electric motors would be larger in size than the electric motors replaced, but the space where the trolley motor is located is large enough for an engine three times as large as the electric trolley motor. Plaintiffs' witness further stated that no special adaptions to another motor would be necessary in order to attach it by nuts and bolts in place of the electric motor, and that the base and plates on the crane are strong enough to also bolt a gasoline motor to the crane (R.20–21); and that while gasoline and diesel engines would weigh more than the electric motors they replaced, the total extra weight would be very minor, and would not have any effect on the structure of the crane or on its balance or lifting capacity. (R.21–22.)

Further testifying on cross-examination, Mr. Piepers stated that the safety features incorporated in the crane consist of overhead switches, or cut-out switches which prevent the traveling hook from being brought up too close underneath the "jibs" and which cut off the hoist motor when too heavy a load is picked up. He stated that a conversion to nonelectrical motive power would necessarily sacrifice these safety features. (R.24.) The witness stated that he had never supervised any conversion such as that about which he testified.

On redirect examination, Mr. Piepers stated that there are mobile cranes which have gasoline engines, as the source of motive power, which perform the same functions as the crane used by his company, and that while these cranes do not have the safety features for overload function, the operators of these cranes are made sure of their capacity and such cranes are operated within their "rated safety." (R.27.)

The primary question here presented for determination is whether the imported crane, together with the three electric motors, is properly classifiable as an entirety under the provisions of paragraph 353 of the Tariff Act of 1930, as modified, *supra*, as an article having as an essential feature an electrical element or device. Both parties to this controversy have directed our attention to a number of cases decided by this and our appellate court relative to a determination of the particular question in issue, as hereinafter noted.

In United States v. Dryden Rubber Co., 22 CCPA 51, T.D. 47050, the court in passing upon the rule for classification of "electrical devices" under paragraph 353 of the Tariff Act of 1930, at page 54, stated:

> * * * The electrical feature must be an essential feature, without which the article will not function, normally, for the purposes intended * * *.

From what has been said, it follows that if the article, when it is imported, is designed and constructed to use electrical power, or other power, interchangeably, then it has not, as an essential feature, an electrical element or device.

In Ralph C. Coxhead Corp. v. United States, 22 CCPA 96, T.D. 47080, the involved importations consisted of several calculating machines, imported in a knocked-down condition, which were operated by an electric motor compactly fitted into the bottom of each machine. The court therein, at page 102, stated that:

> * * * The motor would not be an essential element of a calculating machine if the machine as imported was so designed and constructed that it might, without substantial modification, be interchangeably operated by hand or electrical power.

See, also, Keer, Maurer Company v. United States, 48 Cust.Ct. 205, C.D. 2336, and Frank P. Dow Co., Inc., and Evergreen Distributors, Inc. v. United States, 52 Cust.Ct. 235, Abstract 68234.

It is axiomatic that the finding of the collector upon which the classification of merchandise is predicated carries with it a presumption of correctness. Gallagher & Ascher Company v. United States, 52 CCPA 11, C.A.D. 849. Further, the plaintiff in a classification case must prove not only that the collector's classification is wrong, but he must also establish the correctness of his claim. Joseph E. Seagram & Sons, Inc. v. United States, 30 CCPA 150, C.A.D. 227. Further, it is well established that the collector is presumed to have found every fact to exist that was necessary to sustain his classification. E. I. du Pont de Nemours & Co. v. United States, 27 CCPA 146, C.A.D. 75, and United States v. Marshall Field & Co., 17 CCPA 1, T.D. 43309. In our opinion, the testimony of plaintiffs' witness in the case at bar is not of sufficient probative value to overcome the presumption of correctness attaching to the classification of the collector. The record herein discloses that although his company has considered converting the motive power of the crane from electric motor power to diesel or gasoline motor power, he had never seen a crane so converted (R.18), nor had he ever supervised any conversion from the electric motors to a gasoline or diesel motor, having merely "discussed it with the engineering department of the factory when I was in France." (R.25.) The testimony of plaintiffs' witness is, on the whole, too general in nature to support the burden of proof imposed upon the plaintiffs in this case. When asked "What sort of other motive power could be used" in replacing the electric trolley motor with another type of motive power, plaintiffs' witness replied: "*Most likely* gasoline or diesel engine." (R. 14.) [Italics ours.] The above answer, in our opinion, is indicative of the speculative nature of the testimony of plaintiffs' witness. Further, while Mr. Piepers testified that the electric motors under consideration could be replaced by other sources of motive power, no cost of such replacements or of materials or labor was given. Plaintiffs' witness when asked on cross-examination whether he would not have to make special adaptions to a motor in order to attach it by nuts and bolts in place of the electric motor, replied:

> A. I don't *think* so. I *think* you can—the base, and the plates which are on the crane, are strong enough to take also, to bolt also a gasoline motor to it. * * * [R.21.] [Italics ours.]

While this witness stated that if the replacement motors are very heavy, hydraulic controls could be used to make it easier for the operator, he did not know if these hydraulic controls would be run by a diesel or gasoline engine because "I'm not a mechanical engineer and would not know." (R.18.) In our opinion, the testimony of plaintiffs' witness is in the main purely speculative and fails to establish that "the substitution of nonelectric features for the electrical ones can be made without substan-

tial modification or reconstruction of the functional properties of the machine" here involved. *Keer, Maurer Company* case, *supra.*

As heretofore indicated, plaintiffs' witness testified that the safety features incorporated in the crane consist of certain overhead switches. He admitted that a conversion to nonelectrical motive power would necessarily sacrifice these safety features. (R.24.) In our opinion, these safety features, present when the crane is operated by electric motors, are essential parts to insure the safe operation of the crane in question. Without the electric motors, the switches are useless and the crane itself, in our opinion, cannot function in the safe and efficient manner in which it was intended to operate. Accordingly, in turn, the electric motors which operate these safety switches are, in our opinion, essential elements or devices of the crane.

Further support for a denial of plaintiffs' claim in this case, may be found, in our opinion, by reference to plaintiffs' exhibit 1. This exhibit illustrates the complete imported crane in its erected position with the exception "that this particular crane was imported as a stationary crane, without the traveling bogies, traveling device." (R.9.) On the reverse side of plaintiffs' exhibit 1, under the general heading of "Specification", the following information appears:

### ERECTION

The patented telescopic device consists of a mechanical screw jack, which is driven by the *slewing* motor. *Electrically operated switches* prevent the screw from overrunning, and make this operation perfectly safe. [Emphasis supplied.]

The above reference indicates, in our opinion, that the slewing motor and the switches are essential to the proper functioning of the imported crane and, accordingly, the crane contains as essential features electrical elements or devices.

Defendant in its brief, maintains that plaintiffs have failed to prove the correctness of its claims that the imported crane is properly dutiable as a machine, not specially provided for, and that the electric motors are properly dutiable as electric motors of more than $\frac{1}{10}$ horsepower but less than 200 horsepower. Specifically, defendant maintains that plaintiffs have failed to establish whether the involved motors are standard or "general" purpose motors, so as to permit the involved electric motors to be separately classified as such under the claimed provision. In this connection, our attention is directed to the holding of the court in Gene Miller, Atwood Imports, Inc. v. United States, 59 Cust.Ct. 212, C.D. 3125. (Rehearing granted November 18, 1967.)

In the *Gene Miller* case, *supra,* the merchandise involved consisted of certain woodworking machines with electric motors. The machines and motors were assessed with duty, as in the case at bar, as entireties at the relevant rate under paragraph 353 of the Tariff Act of 1930, as modified, as articles having as an essential feature an electrical element or device. Plaintiffs therein also claimed the machines properly dutiable under paragraph 372 of said act, as modified, at the applicable rate as woodworking or other machines, not specially provided for, and the electric motors themselves dutiable under paragraph 353 of the act, as modified, as motors of more than $\frac{1}{10}$ horsepower but less than 200 horsepower. After a review of the evidence therein, the court in the *Gene Miller* case, *supra,* concluded that the record therein established that the involved woodworking machines could be operated without substantial modification by motive power other than electricity and were not essentially electrical articles. The court, however, pointed out that it has been held that the burden rests on the plaintiff to establish not only that the machines *per se* are not essentially electrical articles but that the electric motors are standard or multipurpose motors and are not designed for use exclusively with the imported machines. See, also Border Brokerage Company, Inc., et al. v. United

States, 58 Cust.Ct. 185, C.D. 2929; Elser Elevator Company v. United States, 58 Cust.Ct. 432, C.D. 3009; Inter Maritime Fwdg. Co., Inc. v. United States, 58 Cust. Ct. 507, C.D. 3030. In overruling the protests without affirming the collector's classification, the court in the *Gene Miller* case, *supra*, page 224, stated:

In the instant case, it was shown that the motors were readily detachable and that the machines could have been purchased without them. However, there is nothing in the record to indicate whether the motors were multipurpose or whether they were designed exclusively for use on the woodworking machines. On this record, the court cannot determine whether the motors were, or were not, dedicated to use with these machines, and whether they were, or were not, parts of the machines in the tariff sense. Therefore, we are constrained to overrule the protests without affirming the collector's classification. Judgment will be entered accordingly.

In the *Elser Elevator* case, *supra*, the court, page 437, stated:

Notwithstanding our present finding that the involved escalators are not essentially electrical articles, it does not necessarily follow that in their imported condition appraisement of the subject escalators as entireties was not justified or proper, that is to say, each escalator together with its accompanying motors constituting a single tariff entity. Plaintiff has adduced no proof tending to show that the electric motors are not integral parts of the escalator with which they are associated and imported, and that they were not designed for use with and intended to be used with these escalators exclusively.

Granted that the instant record does show that the subject motors are easily removed from the escalators of which they are part (for purposes of replacement with another source of power as in the case of the demonstrated use herein of the gasoline engine), it

has not been shown to what other purpose or purposes these motors are capable of being put if not in driving and braking the involved escalators. It has not been established that these motors are what might be regarded as being standard or multiple-purpose electric motors. Such proof, we think, is prerequisite to a finding that the involved escalators and their motors constitute separate tariff entities. See and compare Supreme Woodworking Machine et al. v. United States, 54 Cust.Ct. 368, Abstract 69204. Since plaintiff has made no protest claim for classification of the involved escalators *and their motors* under the provision for machines in paragraph 372, the protest must be overruled, without, however, affirming the classification of the collector.

While we are of opinion that the plaintiffs in this case have failed to establish that the imported crane could be operated without substantial modification by motive power other than electricity, there is another factor which persuades us to a conclusion that the classification made by the collector in this case was correct. As was similarly stated in the *Gene Miller* and *Elser Elevator Company* cases, *supra*, the burden rests on the plaintiff to establish not only that the crane *per se* is not an essentially electrical article but it must be established that the electric motors are standard or multipurpose motors and are not designed for use exclusively with the imported crane. In the case at bar, it has not been established by competent proof whether the imported electric motors are general purpose motors, or motors specially designed for use with the imported crane. Further, other than a single statement by plaintiffs' witness to the effect that the electric motors could be used for other purposes, there is no proof as to whether any alterations would have to be made to the electric motors under consideration to adapt them to other uses.

For all of the reasons heretofore stated, we hold that the imported crane and the motors are properly dutiable as

an entirety under the provisions of paragraph 353 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739 at the rate of 13¾ per centum ad valorem as an article having as an essential feature an electrical element or device, as classified. The protest is overruled. Judgment will issue accordingly.

RAO, Chief Judge (concurring):

In view of the decision in John H. Faunce Phila., Inc. v. United States, 60 Cust.Ct. 369, C.D. 3393, and solely on the ground of the absence of proof with regard to whether the imported electric motors are general or special purpose motors, I concur in the result.

FORD, Judge:

I concur in the result.